### AMERICAN STATES INSURANCE CO., Plaintiff,

v.

### SACRAMENTO PLATING, INC., et al., Defendants.

#### No. Civ. S–93–0569–WBS/PAN.

United States District Court, E.D. California.

Aug. 29, 1994.

---

Martha S. Hollingsworth, Bingham Summers Welsh and Spilman, Indianapolis, IN, Craig Edward Farmer, Farmer and Murphy, Rancho Cordova, CA, for American States Ins. Co.

Richard Perry, pro se.

Daniel William Smith, Hefner Stark and Marois, Sacramento, CA, for Arthur LaBour.

Craig C. Allison, Downey Brand Seymour and Rohwer, Sacramento, CA, for Alice Kazanjian.

Alice Kazanjian, pro se.

Edwin B. Medlin, Ropers Majeski Kohn Bentley Wagner and Kane, Redwood City, CA, Craig Edward Farmer, Farmer and Murphy, Rancho Cordova, CA, for Royal Ins. Co. of America.

Daniel William Smith, Hefner Stark and Marois, Sacramento, CA, for Arthur LaBour.

## MEMORANDUM AND ORDER

SHUBB, District Judge.

American States Insurance Company ("ASI") brought this action seeking a declaration that certain ASI comprehensive general liability ("CGL") policies do not cover clean-up costs resulting from the contamination of soil below a Sacramento metal electroplating facility. The defendants are the property owners and the operators of the facility.

ASI has filed a motion for summary judgment on its claim for declaratory relief and on defendant Arthur LaBour's counterclaims. Only LaBour, the current property owner, filed a memorandum in opposition to ASI's motion. Because the court finds that the

pollution exclusions contained in ASI's policies preclude coverage, the motion for summary judgment will be granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties and the Property

The dispute centers on four parcels of property located on "S" Street in Sacramento, California. On one parcel, located at 2809 "S" Street, was an industrial electroplating facility. In 1963, defendants Richard and Arlene Perry ("Perry") entered into a contract to purchase the property from defendant Alice Kazanjian. In February 1972, title was transferred from Kazanjian to Perry.

From 1963 to 1988, Perry, the former owner and general manager of Sacramento Plating, Inc. ("SPI"), operated the electroplating facility. During that time, Richard Perry "was physically at the site watching and participating in the electroplating processes on a full-time daily basis...." Perry Decl. ¶ 5.

LaBour purchased the property from Perry in January 1981. After purchasing the property, LaBour leased it back to Perry until October 1989. LaBour is the present owner of the property.

### B. The ASI Policies

ASI issued CGL policies covering Perry/SPI and LaBour for different periods of time during SPI's operation at the "S" Street site. ASI issued two policies to Perry/SPI for two one-year periods between March 6, 1984 and March 6, 1986 (hereinafter "S1" and "S2"). ASI may have issued a third one-year policy covering the period of time between March 6, 1986 and March 6, 1987 (hereinafter "S3").[1]

ASI issued LaBour a total of three CGL policies. The first two policies covered two one-year time periods from March 23, 1984 to March 23, 1986 (hereinafter "L1" and "L2"). The third policy period began March 23, 1986, but was cancelled effective May 21, 1986 (hereinafter "L3").

---

1. The parties agree that the policy may have been issued, but that it cannot, at present, be located.

## C. The CAL–EPA Order

On April 22, 1992, the California Environmental Protection Agency Department of Toxic Substances Control ("CAL–EPA") issued an "Imminent and Substantial Endangerment Determination and Order" ("the Order") concerning the "S" Street property. The Order named as "responsible parties" LaBour, Richard Perry, and others connected with the operation of SPI.

In the Order, the CAL–EPA made the following finding:

> During the period that Sacramento Plating operated at the Site (1972–1990), various chemicals were handled and stored inside and immediately outside of the plating shop building. Over time these chemicals were discharged to the concrete floor underlying the plating shop and in the rear storage area. The chemicals either spilled/ leaked from the storage tanks, were discharged to the floor from plating tanks as a result spillage [sic], or due to the dipping of parts being plated.

The CAL–EPA took samples from inside the plating shop and from the soil under the shop's concrete floor and discovered lead, chromium, copper, antimony, nickel, and cyanide contamination. It explained that these chemicals present a danger to humans through direct contact by way of inhalation, absorption, and/or ingestion. The people at risk were determined to be transients who might enter the building, firefighters who might be called to the building, and nearby residents who could "be exposed through inhalation of dusts and gases generated by heating of contaminants."

The Order directed that particular remedial action be taken. The parties were directed to prepare a "Preliminary Endangerment Assessment" ("PEA report") evaluating the magnitude of the hazard, the danger to public health, and the necessary "remediation action(s)." A Project Coordinator was to be appointed to provide oversight, and the parties were to prepare a "Sampling Plan which describes the activities which will be undertaken to provide a preliminary profile of the contamination at the site." Upon completion of the necessary reports, the parties were to take all required steps to "stabilize and eventually remediate" the hazard.

In addition to requiring the PEA report, the CAL–EPA Order also made clear that all costs incurred in complying with the Order were to be borne by the parties. It stated that the parties could also be liable for statutory fees imposed under state or federal law. And it reserved the right to require the parties to compensate the state for any costs the state incurred in its work at the site.

## D. The PEA Report

An environmental consulting firm, Brown and Caldwell ("BC"), was retained by LaBour to analyze the nature and extent of the contamination and to prepare the PEA report. The report, according to BC was "the first step in the remediation process and indicates whether or not further cleanup is needed on site, assesses the immediate danger, if any, to the public, and recommends the course of further action."

BC studied the now-abandoned plating facility and took samples of the soil underneath the concrete flooring. It identified a number of hazardous toxic substances in the soil that were deposited by the plating operation.

> Degraded concrete and standing water in some drain lines indicate possible soil contamination due to dysfunctional drainage and degraded foundation. Some crystals were noted in one of the drain lines. These crystals are an indication of heavy accumulations of some constituents.

BC found unsafe levels of chromium, copper, nickel, and lead in the soil.

The PEA report concluded that "[p]ast practices at the site have resulted in elevated levels of metals in the underlying soils." Although the site was not found to pose a significant threat to the general public, BC found that transients sleeping in the building were at immediate risk. BC recommended further study as to whether the contaminants were migrating from under the plating facility to neighboring property or into the groundwater.

Although LaBour complied with the order to have the PEA report prepared, he has taken no action to "stabilize" or "remediate"

the contamination. LaBour Decl. ¶ 3–4. On July 6, 1994, CAL–EPA notified LaBour that he has "not taken the required actions to satisfy Section 16.5 *Removal/Remedial Actions* of the Order." *See* LaBour Decl.Ex. B (Letter from Wolfenden to LaBour of 7/6/94). As a result, CAL–EPA will perform the necessary cleanup "and seek recovery for all costs incurred, including administrative costs." *Id.*

### E. The Coverage Dispute

#### 1. ASI's rejections of LaBour's coverage request

On June 15, 1992, LaBour notified ASI of the CAL–EPA Order and requested that ASI defend and indemnify him. ASI Compl. ¶ 14. ASI responded with its opinion that it has no liability to cover or defend LaBour or any other party "for the claimed relief under the Order." ASI Request for Judicial Notice Exh. 3, at 2 (filed Feb. 1, 1994). ASI, therefore, declined to cover LaBour for any financial expenditure, past or future, connected with LaBour's compliance with the Order.[2] *Id.*

#### 2. LaBour's state court action

On September 28, 1992, LaBour filed suit in Sacramento County Superior Court against Perry, SPI, and others. LaBour asserted that the named defendants

> caused the discharge/release/disposal of hazardous substances on, in, and under the Subject Property during the term of Defendant's ownership, lease or possession of the Subject Property, and that these materials were not removed by Defendants, but remain on the Subject Property to the present time creating hazardous conditions on the Subject Property.

LaBour Super.Ct.Compl. ¶ 23. He further claimed that he was not responsible for any damage to the property. LaBour Super.Ct.Compl. ¶ 24.

LaBour pleaded fourteen different state-law causes of action against various combinations of the defendants. He asked the court for compensatory, general, and treble damages; a declaration that the defendants were liable to him for all costs incurred responding to the Order; costs of suit and attorneys fees; and other relief. LaBour Super.Ct.Compl. at 24–25.[3]

On October 20, 1992, Perry/SPI notified ASI of the complaint and requested defense and indemnification. ASI assumed the defense subject to its full reservation of rights.

#### 3. ASI's federal declaratory judgment action

On April 5, 1993, ASI filed this declaratory judgment action. ASI asks the court to declare its rights and responsibilities under its insurance contracts with LaBour and with Perry and SPI. Specifically, it seeks a declaration that it has no obligation to defend or indemnify LaBour or Perry/SPI with regard to the CAL–EPA Order, nor an obligation to defend or indemnify Perry/SPI with regard to LaBour's state court action.

Both LaBour and Perry/SPI answered ASI's complaint. LaBour then filed a counterclaim against ASI and a crossclaim against the Royal Insurance Company ("Royal"). LaBour alleges that in refusing to defend or indemnify him with regard to the CAL–EPA Order, the two insurance companies breached their contracts with him. In addition to damages for breach of contract, LaBour seeks a declaration that ASI and Royal are obligated to defend him from CAL–EPA's claims and indemnify him for any losses, damages, or costs resulting from those claims.

### II. LEGAL STANDARDS

The court must determine, viewing the evidence in the light most favorable to LaBour, whether ASI has shown that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See*

---

2. ASI also advised Perry and SPI of the EPA order and of its position that it had no coverage liability for expenses or damages incurred by Perry or Sacramento Plating under the Order. ASI Compl. ¶ 15; ASI Request for Judicial Notice Exh. 2 (filed Feb. 1, 1994).

3. On November 5, 1993, LaBour filed a motion asking the court to abstain from exercising jurisdiction over the federal action. On February 8, 1994, the court denied LaBour's motion pursuant to *American States Ins. Co. v. Kearns*, 15 F.3d 142 (9th Cir.1994).

Fed.R.Civ.P. 56(c); *Continental Casualty Co. v. City of Richmond,* 763 F.2d 1076, 1079 (9th Cir.1985).

Because the court's jurisdiction is based on diversity of citizenship and the insured property is located in California, California substantive law applies. *See Insurance Co. of Pennsylvania v. Associated Int'l Ins. Co.,* 922 F.2d 516, 520 (9th Cir.1990); *Continental Casualty,* 763 F.2d at 1079. "An insurance policy, like all contracts, is to be interpreted to effectuate the mutual intent of the parties." *Titan Corp. v. Aetna Casualty & Sur. Co.,* 22 Cal.App.4th 457, 469, 27 Cal.Rptr.2d 476 (1994). "The 'clear and explicit' meaning of the contract provisions, as interpreted in their 'ordinary and popular sense,' controls the court's interpretation." *Western World Ins. Co. v. Dana,* 765 F.Supp. 1011, 1013 (E.D.Cal.1991) (quoting *AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 822, 274 Cal. Rptr. 820, 799 P.2d 1253 (1990)).

When a policy clearly excludes coverage, the court "will not indulge in tortured constructions to divine some theoretical ambiguity in order to find coverage." *Titan Corp.,* 22 Cal.App.4th at 469, 27 Cal.Rptr.2d 476. "An insurer is entitled to limit its coverage to defined risks, and if it does so in clear language, [the court] will not impose coverage where none was intended." *Id.*

## III. DISCUSSION

ASI contends that the pollution exclusions contained in each of the policies it issued to LaBour and Perry/SPI bar coverage as a matter of law.[4]

**4.** Alternatively, ASI argues that because the pollution was not discovered until after the policy periods expired, the policies do not cover the pollution. The lower California courts are split regarding the proper test to apply in resolving this issue. Some courts have held that the question is whether the pollution "manifested" itself in the form of property damage during the insurance policy period. *See, e.g., Pines of La Jolla Homeowners Ass'n v. Industrial Indem.,* 5 Cal. App.4th 714, 720–22, 7 Cal.Rptr.2d 53 (1992). Other courts have held that the question is whether there was a "continuing injury" caused by contamination which occurred during the policy period. *See, e.g., Montrose Chem. Corp. v. Admiral Ins. Co.,* 20 Cal.App.4th 678, 695–97, 5 Cal.Rptr.2d 358 (1992). On May 21, 1992, the California Supreme Court granted review of the

## A. The Policy Language

The ASI policies issued to LaBour and Perry/SPI contain two different pollution exclusions. The L3 and S3 policies contain absolute pollution exclusions. The parties agree that the absolute exclusions bar coverage under these policies.

The L1, L2, S1, and S2 policies also contain pollution exclusions. These exclusions, however, contain an exception for "sudden and accidental" pollution:

Exclusions—This insurance does not apply:

.    .    .    .    .

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;* ....

■ "Under California law, the interpretation of an exclusionary clause [in an insurance contract] is an issue of law upon which the court must make its own independent determination." *Continental Casualty,* 763 F.2d at 1079; *Truck Ins. Exchange v. Pozzuoli,* 17 Cal.App.4th 856, 859, 21 Cal.Rptr.2d 650 (1993). The burden is on the insured, LaBour in this case, to prove that the "sudden and accidental" exception to the pollution

*Montrose Chemical* case. *See* 24 Cal.Rptr.2d 661, 862 P.2d 661 (1992). The Supreme Court's decision in that case should definitively resolve the issue regarding the appropriate test.

Because the court grants ASI's motion upon the grounds that coverage is precluded by the pollution exclusions, it does not reach this argument. If the court were not able to decide this motion on other grounds, however, a different approach might be appropriate. *See* C. Wright, et al., *Federal Practice and Procedure* § 4246, at 111 (1988). *Cf. Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 27, 79 S.Ct. 1070, 1072, 3 L.Ed.2d 1058 (1959) (recognizing "the wisdom of staying actions in the federal courts pending determination by a state court of decisive issues of state law" and affirming abstention pending decision by state court).

exclusion applies. *Aeroquip Corp. v. Aetna Casualty & Sur. Co.*, 26 F.3d 893, 895 (9th Cir.1994) (per curiam).

### B. ASI's Evidence of Gradual Pollution

■ ASI argues that LaBour has not carried his burden. ASI points to undisputed evidence that for twenty-five years toxic chemicals were regularly spilled onto the concrete floor of the plating facility. According to Richard Perry,

> During the electroplating process, various automobile parts to be plated (primarily steel bumpers) were cleaned, rinsed and plated with use of chemical solutions in the plating room. The parts would be immersed in chemical baths with platers (i.e. employees of SACRAMENTO PLATING, INC.) moving the parts by hand from bath to bath through the process. *In doing so, the chemicals in liquid form would normally splash and/or drip off the parts, onto the catwalk surfaces and from there to the flooring as each part was being transferred from one chemical bath to the next. Chemical solutions would also drip down the sides of and off the tanks causing a residue on the sides of the tanks.*

Perry Decl. ¶ 7 (emphasis added). As the parts that were being treated were moved between the chemical baths, "chemicals that were spilled, splashed or dripped off the parts were also washed down the slanted flooring into the drainage system and from there into the sewer *on a daily basis* while the facility was in operation." Perry Decl. ¶ 9 (emphasis added).

■ The deposition testimony of Joe Yun corroborates Perry's account.[5] Yun is a scientist and environmental consultant employed by BC. He was a project manager in charge of preparing the PEA Report regard-

ing LaBour's property. Based on his visual inspection of the facility and subsequent soil samples, Yun testified that it was his opinion that the drain in the concrete floor of the plating shop "has been degraded over time, so any solution in those drains have access to the underlying soils." Yun Dep. 70:17–20; 71:3–8. When asked what events likely caused the soil contamination, Yun stated:

> Likely events which caused contamination at that site would include degradation of the drainage system over time from chemicals or substances that went through the drainage system subsequently exposing underlying soils, allowing those materials that use the drainage system access to the soils under the building.

Yun Dep. 307:13–19.

### C. LaBour's Evidence of "Sudden and Accidental" Pollution

Notwithstanding this evidence, LaBour argues that three specific incidents raise a triable question as to whether the soil contamination was "sudden and accidental." Richard Perry witnessed three large spills during the 1980s. In 1981, acid copper liquid in a tank in the plating facility escaped through a hole in the tank or in the tank's liner. The liquid poured onto the concrete floor and into the drainage system. Perry Decl. ¶ 11. In June 1984, an 800–gallon nickel plating tank overflowed when a water hose was left running in the tank. The contents of the tank ran onto the floor and into the drain. *Id.* Finally, in May 1985, 400–gallons of chemical from a different nickel plating tank were released from a hole in the tank or its liner and flooded onto the floor and down the drain. *Id.* ASI does not dispute that these incidents occurred.

---

**5.** LaBour objects to Yun's deposition testimony on the ground that there are insufficient foundational facts regarding Yun's qualifications and as to the scientific methods used to reach his conclusions. The objection is overruled. In considering a motion for summary judgment, the court has broad discretion in ruling upon the admissibility of expert testimony. *See Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1123 (5th Cir.1988) (per curiam). ASI has attached to its moving papers those portions of Yun's deposition upon which it relies. Those

excerpts set forth Yun's qualifications as well as his opinions. Under Fed.R.Evid. 705, an expert may testify in terms of opinion without first testifying to the underlying facts or data. He may then be required to disclose the underlying facts or data on cross-examination. Counsel for LaBour had the opportunity to cross-examine Yun on both his qualifications and the methods used to reach his opinion, but chose not to provide the court with any portions of the deposition which would call into question either the witness' qualifications or the bases of his opinions.

LaBour concedes that "at some unspecified time" the concrete floor or the drainage system was compromised. As a result, he reasons, when the three large spills occurred, the chemicals may have been carried into the soil below the floor—thus causing the contamination. LaBour contends, first, that these spills were "sudden and accidental," and, second, that they create a genuine issue of material fact as to whether the contamination itself was "sudden and accidental."

Under California law, the term "sudden and accidental," as used in CGL policies, is not ambiguous. See Pozzuoli, 17 Cal.App. 4th at 860, 21 Cal.Rptr.2d 650; Shell Oil Co. v. Winterthur Swiss Ins. Co., 12 Cal.App.4th 715, 752–56, 15 Cal.Rptr.2d 815 (1993). "[I]n the phrase, 'sudden and accidental,' 'accidental' conveys the sense of an unexpected and unintended event, while 'sudden' conveys the sense of an unexpected event that is abrupt or immediate in nature." Shell Oil, 12 Cal. App.4th at 755, 15 Cal.Rptr.2d 815. "Sudden and accidental" pollution, the Court of Appeal has stated, "unambiguously does not include gradual pollution." ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co., 17 Cal.App.4th 1773, 1787, 22 Cal. Rptr.2d 206 (1993).

In two recent cases, the state Court of Appeal denied coverage on the ground that the pollution in question was gradual. In Pozzuoli, the owners of a gas station sought insurance coverage for property damage resulting from a· gasoline leak in an underground storage tank. 17 Cal.App.4th at 858, 21 Cal.Rptr.2d 650. Their CGL policy contained the standard pollution exclusion with an exception for "sudden and accidental" pollution. Id. It was undisputed that the gasoline leakage was gradual and occurred over a long period of time. Id. at 859–60, 21 Cal. Rptr.2d 650. The court held that because "the pollution process was both continuous and long-term," the "sudden and accidental" exception did not apply and coverage was barred by the pollution exclusion. Id. at 861, 21 Cal.Rptr.2d 650. See also ACL Technologies, 17 Cal.App.4th 1773, 22 Cal.Rptr.2d 206 (coverage unavailable because pollutants escaped from underground storage tanks through leaks caused by corrosion, and that

corrosion occurred gradually over extended period of time).

The present case is somewhat different because in addition to evidence of gradual contamination, there were the three incidents witnessed by Perry which LaBour argues may have caused "sudden and accidental" pollution. The court finds, however, that these incidents do not create a triable issue of fact for three reasons.

First, as a matter of law the incidents were not "sudden and accidental." "An 'accidental' event is both unintended and unexpected; omitting either leaves an important part of the word's meaning unexpressed. A 'discharge, dispersal, release or escape' of pollutants that is expected is not accidental, regardless of whether it was not intended." Shell Oil, 12 Cal.App.4th at 755, 15 Cal. Rptr.2d 815. The three events identified by Perry involved tanks that leaked or overflowed onto the concrete floor. Prior to the first incident, Perry

constructed a cinder block "berm" at the north and south ends of the plating room facility in order to contain any sewage backup or to otherwise protect both the offices ... and areas of the premises outside the facility ... from any overflow *in the event of a release from any of the tank equipment. Thus, the berm and the slanted flooring were designed to act as a holding pond in the event any tanks should release their contents within the plating room's floor space and until such liquids found their way into the drain system and sewer pipe.*

Perry Decl. ¶ 10. When each of the three incidents occurred, the chemicals involved were contained by the berm and directed into the drainage system. Perry Decl. ¶ 11. Perry's statements indicate that large leaks or spills, although not intended, were certainly not "unexpected." The plating facility was designed by Perry to accommodate just what he expected: infrequent incidents in which large amounts of toxic liquid would be released from a tank onto the floor of the facility. Because both facets of the word "accidental"—"unintended" and "unexpected"—must be applied, Shell Oil, 12 Cal.App. 4th at 755, 15 Cal.Rptr.2d 815, the court finds

that the spills were not accidental because they were not unexpected.

Second, there is no evidence that these incidents, even if "sudden and accidental," caused the soil contamination. The pollution exclusion provides that "property damage arising out of the discharge, dispersal, release or escape of . . . contaminants or pollutants" is not covered unless "such discharge, dispersal, release or escape is sudden and accidental." Under this plain language, the property damage must be caused by a "sudden and accidental" "discharge, dispersal, release or escape" of "contaminants or pollutants."

It is not disputed that toxic liquids from the plating process caused the soil contamination. LaBour asserts that there is a triable issue as to whether the three incidents identified by Perry were the specific sources of the contamination. LaBour, however, adduces no evidence that these incidents—as opposed to the commonplace splashing, spilling, and dripping of toxic liquid onto the concrete floor—caused the contamination. LaBour points out that the precise time at which the integrity of the concrete floor was compromised is not established;[6] thus the concrete could have just as likely degraded after the 1981, 1984, and 1985 incidents as before those incidents. If so, the three large spills would have been contained and drained into the city sewage system without contaminating the soil beneath the concrete.

Third, even if the incidents did cause some soil contamination, they only contributed to contamination caused by pollution occurring in the regular course of the plating operation. It is not disputed that the ordinary splashing, spilling, and dripping of chemicals during the plating process occurred for years both before and after the three incidents. Therefore, no matter when the drainage system and floor degraded enough to allow toxic liquid to reach the soil below, contamination was occurring during the regular course of the facility's operation.

In *Smith v. Hughes Aircraft Co.*, 22 F.3d 1432 (9th Cir.1993), the insured regularly discharged some amount of a toxic chemical into unlined, outdoor ponds. The evidence showed that the insured "encountered periodic episodes where the waste treatment plant broke down or was over-capacitated."[7] During these episodes, toxic chemicals were dumped directly into the ponds. 22 F.3d at 1438. The insured argued that these "sudden" events partially caused the injuries suffered by the claimants. Both the district court and the court of appeals rejected the insured's argument that the "sudden and accidental" exception applied. The court of appeals accepted the district court's refusal to "break down [the insured's] long-term waste practices into temporal components in order to find coverage where the evidence unequivocally demonstrates that the pollution was gradual." *Id.*

Legally, the instant case is not distinguishable. At some point in time the concrete floor and drainage system of the plating facility degraded to the point where toxic liquids were able to penetrate into the soil below. SPI's "long-term waste practice" was to permit toxic liquids to drip, splash, and spill onto the floor and flow into the drain. On three occasions, large quantities of toxic liquid spilled onto the floor and flowed down the drain. By the design of the plating facility, it was SPI's "waste practice" to contain both large spills and drips, splashes, and small spills on the concrete floor, to direct them down the drain, and to send them into the city sewer system. Under *Smith*, the court may not break these practices "into temporal components in order to find coverage."

On summary judgment, the moving party has the initial burden to "show that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). If the moving party meets this burden, the burden shifts to the non-moving

---

**6.** *See* Yun Decl. ¶ 2, submitted by LaBour in opposition to summary judgment.

**7.** *Smith v. Hughes Aircraft Co.*, 783 F.Supp. 1222, 1232 n. 14 (D.Ariz.1991).

party "who must present significant probative evidence tending to support its claim or defense." *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir.1987). The non-moving party's burden is to "set forth, by affidavit or as otherwise provided in Rule 56, *'specific facts* showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (quoting Fed. R.Civ.P. 56(e)) (emphasis added in opinion). Summary judgment is appropriate if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

ASI carried its burden under Rule 56(c) by pointing out that there is no evidence that the soil contamination was caused by a sudden and accidental pollution event. LaBour, who bears the ultimate burden of proving that the "sudden and accidental" exception to the pollution exclusion applies, *Aeroquip,* 26 F.3d at 895, did not meet his burden under Rule 56(e). Instead of providing the court with significant probative evidence that the three spills identified by Perry were accidental and were the direct cause of the soil contamination discovered by CAL–EPA, LaBour poses a number of unanswered questions:

> [W]hat caused the compromise of the concrete floor and when? Was the concrete floor compromised as a result of the heavy concentration of toxic chemicals released as a result of one or more of the three "sudden and accidental events?" Or, at the time of the event in question, had the concrete floor already been compromised as a result of the small amounts of toxins landing on the floor as a result of activities prior to that particular event in question? Was the concrete floor compromised as a result of the first event? The second? The third? When? How?

Def's Mem. Opp. at 9. In opposing summary judgment, however, LaBour "must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. A "series of insinuating questions," which "resemble tenuous speculations rather than potentially valid conclusions that could be grounded in evidence in the record," is insufficient to defeat a motion for summary judgment. *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551, 1558–59 (9th Cir.1991). *See also Washington v. Armstrong World Indus., Inc.,* 839 F.2d 1121, 1123 (5th Cir.1988) (per curiam) ("A claim that further discovery or a trial might reveal facts which [the non-moving party] is currently unaware of is insufficient to defeat the motion.").

LaBour's unanswered questions reveal that, even after all discovery has been completed,[8] he cannot produce evidence that the soil contamination was caused by a "sudden and accidental" pollution event. Accordingly, the court finds that there are no genuine issue of material fact for trial and ASI is entitled to judgment as a matter of law.

IT IS THEREFORE ORDERED that ASI's motion for summary judgment be, and the same is, hereby GRANTED.

---

**8.** All discovery, with the limited exception of LaBour's deposition, was cut-off on August 1, 1994. *See* Stipulation and Order (lodged Aug. 10, 1994); Order (filed Oct. 5, 1993).