[No. B104163. Second Dist., Div. One. Aug. 28, 1997.]

A-H PLATING, INC., Plaintiff and Appellant, v.
AMERICAN NATIONAL FIRE INSURANCE COMPANY, Defendant
and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts B. through D.

428

**COUNSEL**

Rosin & Elperin and William Elperin for Plaintiff and Appellant.

Murchison & Cumming, Edmund G. Farrell III and James S. Williams for Defendant and Respondent.

## OPINION

**MASTERSON, J.**—Defendant American National Fire Insurance Company (American National) insured plaintiff A-H Plating, Inc., under a commercial general liability policy. Third parties brought claims against A-H Plating, alleging that it was partly responsible for contaminating local groundwater. A-H Plating requested a defense and indemnity from American National, which rejected the request.

A-H Plating then filed this action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory relief. American National moved for summary judgment. The trial court granted the motion on the ground that the policy's "pollution exclusion" precluded coverage. We reverse.

### BACKGROUND

In 1979, A-H Plating commenced electroplating operations at 1837 Victory Place, Burbank, California. It specializes in hard chrome, nickel and cadmium plating, and product engineering and design, primarily for the aerospace industry.

From September 12, 1983, through September 12, 1986, American National insured A-H Plating under a commercial general liability policy. "Coverage D" of the policy required American National "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of property damage caused by an occurrence."[1] American National further agreed "to defend any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . ." The policy excluded coverage for damage to property caused by the discharge or release of contaminants or pollutants, unless the discharge or release was

---

[1]"Property damage" was defined to include "physical injury to or destruction of tangible property which occurs during the policy period including the loss of use thereof at any time resulting therefrom." "Occurrence" was defined as "an accident, including continuous or repeated exposure to conditions, which results during the policy period in . . . property damage neither expected nor intended from the standpoint of the insured."

"sudden and accidental."[2] The policy also excluded damage to property owned, occupied, or rented by the insured, used by the insured, or in the care, custody, or control of the insured.

In February 1991, the United States filed suit against Lockheed Corporation (Lockheed), alleging that it had released hazardous substances into the soil and groundwater in an area known as the "Burbank Operable Unit Site" (United States v. Lockheed Co. (U.S. Dist. Ct. (C.D.Cal.), 1991, No. 91-4527-MRP)).[3] Lockheed settled that case by agreeing to undertake an extensive extraction and treatment program to remediate the contaminated groundwater.

In April 1994, Lockheed filed an action in federal court under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) to recover the cost of remediating the groundwater at the Burbank site (Lockheed Corporation v. Crane Company (U.S. Dist. Ct. (C.D.Cal.), 1994, No. 94-2717-KN)). Lockheed alleged that approximately 107 individuals and entities, including A-H Plating, had contributed to the pollution of the groundwater. By way of its complaint, Lockheed sought to recover all or part of the cost of cleaning up the site.

In a letter dated April 12, 1994, A-H Plating informed American National of the Lockheed action and requested financial and legal assistance in defending the matter. American National retained an investigator to assist it in determining various coverage issues. On July 20, 1994, the investigator interviewed Peter Waschak, the president of A-H Plating since July 1991, and Charles De Cuir, the president from 1979 to 1987.

By letter dated November 21, 1994, American National denied A-H Plating's claim under the policy based on the pollution exclusion. The letter stated in part: "Based upon the information provided to date, we have not seen any evidence of a sudden and accidental release resulting in property damage during the relevant policy period. [¶] The available facts indicate that the contamination, if any, occurred over time and was the result of 'ordinary and/or intentional business practices' . . . ."

---

[2]The "pollution exclusion" stated in full that "[t]his policy does not apply . . . under any liability coverage to . . . property damage arising out of the discharge, disbursal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply . . . if such discharge, disbursal, release or escape is sudden and accidental . . . ."

[3]The Burbank Operable Unit Site is an area designated by the United States Environmental Protection Agency that includes 10 water production wells owned by the City of Burbank. Those wells were shut down because tests taken during the 1980's found volatile organic compounds that exceeded the legal limits for drinking water.

In response, A-H Plating filed this action, alleging causes of action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory relief.[4] The complaint alleged that A-H Plating had notified American National of the Lockheed action as well as similar claims by other parties, all of which sought contribution for the cost of remediating the groundwater at the Burbank site.[5] A-H Plating alleged that American National had failed to properly investigate the third party claims and had wrongfully refused to defend and settle them.

In February 1996, American National filed a motion for summary judgment or, in the alternative, for summary adjudication of issues, arguing that (1) it had no duty to provide a defense or indemnity under the policy because coverage was barred by the pollution exclusion and the "owned property" exclusion and (2) the absence of coverage rendered A-H Plating's breach of covenant claim and request for punitive damages without merit. After full briefing and oral argument, the trial court granted the motion on the ground that A-H Plating "ha[d] not provided facts which showed a potential for coverage under an exception to the pollution exclusion." The trial court reasoned that "[g]radual discharge or release of material is not the sudden release envisioned in the policy." Judgment was entered accordingly. A-H Plating filed a timely notice of appeal.

## DISCUSSION

Summary judgment is appropriate if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

■ "A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . ■ In reviewing the propriety of a summary judgment, the appellate court independently reviews the

[4]In addition to A-H Plating, John and Melba Waschak were also plaintiffs in the action. However, in granting summary judgment, the trial court ruled that the Waschaks had no standing to pursue the case. Although the Waschaks joined in the notice of appeal, they have not challenged the trial court's ruling as to their lack of standing. Consequently, we do not consider them to be parties to the appeal.

[5]Actions were also filed against A-H Plating, among others, by Aeroquip Corporation (Aeroquip Corporation v. Lockheed Corporation (U.S. Dist. Ct. (C.D.Cal.), 1995, No. 95-2835-TJH)) and H.M. Holdings, Inc. (H.M. Holdings, Inc. v. A-H Plating, Inc. (U.S. Dist. Ct. (C.D.Cal.), 1995, No. 95-1877-RG)).

record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed." (*Hanooka* v. *Pivko* (1994) 22 Cal.App.4th 1553, 1558 [28 Cal.Rptr.2d 70], citations omitted; see also Code Civ. Proc., § 437c, subd. (*o*)(2).) We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. (*Kelleher* v. *Empresa Hondurena de Vapores, S.A.* (1976) 57 Cal.App.3d 52, 56 [129 Cal.Rptr. 32].) In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true. (See *Zeilman* v. *County of Kern* (1985) 168 Cal.App.3d 1174, 1179, fn. 3 [214 Cal.Rptr. 746]; *Neinstein* v. *Los Angeles Dodgers, Inc.* (1986) 185 Cal.App.3d 176, 179 [229 Cal.Rptr. 612].)

## A. Duty to Defend

■ " '[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. . . . "[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." . . . Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. . . .' . . .

" 'The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy . . . .' . . . '[F]or an insurer, the existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, but upon those facts known by the insurer at the inception of a third party lawsuit. . . . Hence, the duty "may exist even where coverage is in doubt and ultimately does not develop." . . .' . . .

"The defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded . . . , or until it has been shown that there is *no* potential for coverage . . . . Imposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf. . . .

"The insured's desire to secure the right to call on the insurer's superior resources for the defense of third party claims is, in all likelihood, typically as significant a motive for the purchase of insurance as is the wish to obtain

indemnity for possible liability. As a consequence, California courts have been consistently solicitous of insureds' expectations on this score. . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

■ " ' . . . [W]here extrinsic evidence establishes that the ultimate question of coverage can be determined as a matter of law on undisputed facts, we see no reason to prevent an insurer from seeking summary adjudication that no potential for liability exists and thus that it has no duty to defend. . . . We see the critical distinction as not whether extrinsic evidence may be considered, but whether such evidence presents undisputed facts which conclusively eliminate a potential for liability.' . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

■ " . . . Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor. . . . [¶] . . . [¶] . . . To prevail [in an action seeking declaratory relief on the issue of the duty to defend], the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.* Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales." (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 295-300 [24 Cal.Rptr.2d 467, 861 P.2d 1153], citations omitted, italics in original.)

### 1. *Pollution Exclusion*

In this case, the insurance policy did not cover the insured for acts of pollution unless the discharge or release of contaminants was "sudden and accidental." ■ In *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715 [15 Cal.Rptr.2d 815], the Court of Appeal explained the meaning of the "sudden and accidental" exception to the pollution exclusion: "An 'accidental' event is both unintended and unexpected; omitting either leaves an important part of the word's meaning unexpressed. A 'discharge, dispersal, release or escape' of pollutants that is expected is not accidental, regardless of whether it was not intended. Therefore, in the phrase, 'sudden and accidental,' 'accidental' conveys the sense of an unexpected and unintended event, while 'sudden' conveys the sense of an unexpected event that is abrupt or immediate in nature. 'Sudden and accidental' is not ambiguous

if we give the words their full significance." (*Id.* at p. 755; accord, *ACL Technologies, Inc.* v. *Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1784-1787 [22 Cal.Rptr.2d 206].)

The *Shell Oil* court also defined "expect," stating: "The ordinary and popular meaning of 'expect' connotes subjective knowledge of or belief in an event's probability. We see no material difference if the degree of that probability is expressed as substantially certain, practically certain, highly likely, or highly probable; the terms are minor shadings of the same idea." (12 Cal.App.4th at p. 746.) Thus, for purposes of the pollution exclusion, an event is "unexpected" if the insured did not know or believe that the event was substantially certain or highly likely to occur. (See *id.* at pp. 746 & fn. 4, 748, 783-784.)

■ With these principles in mind, we examine the evidence that was before the trial court on summary judgment.

In its motion, American National relied primarily on the deposition testimony of Charles De Cuir, whose service as A-H Plating's president included the three-year policy period (Sept. 12, 1983 through Sept. 12, 1986).[6] De Cuir testified that workers would fill up five-gallon buckets with 1-1-1 trichloroethane and empty them into the degreaser tank. De Cuir, who spent eight to ten hours a day "roaming" the shop, witnessed "slight" spills from the buckets on four or five occasions during his eight years as president. Each time, the spill was promptly cleaned up. When the contents of the degreaser (which contained 1-1-1 trichloroethane and perchloroethylene) were "spent," the chemicals were pumped out, which occasionally resulted in a spill of a half gallon or gallon. Those spills were cleaned up immediately. On two or three occasions, De Cuir saw an employee overfill a plating tank (which contained chromic acid, sulfuric acid, and water), causing a spill of 10 to 15 gallons at the most. Because the plating tanks were "bermed," each of those spills was contained.[7] De Cuir also stated that spills of nickel, nitric acid, and sulfuric acid had occurred, all of which were contained by berms.[8]

According to De Cuir, the company had policies concerning the proper handling of chemicals and the cleanup of spills. While De Cuir was president, A-H Plating did not report any spills to an insurance company or

---

[6]American National also submitted the testimony of Peter Waschak, who, as president of A-H Plating in 1994, requested that American National provide a defense of the third party claims. However, because Waschak did not begin working at A-H Plating until 1991, his testimony about company operations was limited to events that occurred after the policy period.

[7]The berm was made of cement and lined with fiberglass.

[8]The record does not disclose what caused these spills or how often they occurred.

government agency because none of the spills were, in his words, of "that magnitude." De Cuir acknowledged that other employees, such as the shop foreman, could have observed spills that he had not seen. However, if the spill was of "any consequence," the employee was required to report it to De Cuir. De Cuir characterized A-H Plating as a "very clean shop" and stated that the company did not pollute the soil or groundwater.

In opposing summary judgment, A-H Plating submitted, among other things, the declaration of Timothy Stevens, who worked at the company from 1983 to 1988. Stevens stated that in 1984, he saw approximately 30 gallons of chemicals that had leaked out of a trough in the back lot. The side of the trough had been crushed and punctured. The chemicals spilled onto a cracked asphalt surface and were not contained within a berm. Although Stevens could not identify with certainty the chemicals in the trough, he knew that trichloroethylene and tetrachloroethylene were regularly kept in that area. Stevens also reported that in or about May 1986, a fire broke out in the painting carrel of the shop. The fire was fueled by containers of lacquer and methyl ethyl ketone. The Burbank Fire Department responded and hosed down the painting carrel, causing paint and methyl ethyl ketone to spill and fill the shop. The painting carrel was not contained within a berm.

Evaluating the record in accordance with *Montrose Chemical Corp.* v. *Superior Court, supra,* 6 Cal.4th 287, we conclude that American National did not establish a lack of potential coverage under the pollution exclusion. We find triable issues of material fact as to whether the spills were sudden and accidental. (Cf. *Truck Ins. Exchange* v. *Pozzuoli* (1993) 17 Cal.App.4th 856 [21 Cal.Rptr.2d 650] [affirming summary judgment for insurer based on pollution exclusion where contamination was caused by continuous, long-term leakage from an underground gasoline storage tank].)[9]

Turning first to the allegations of the third party complaints, we note that they are silent as to the manner in which A-H Plating allegedly contaminated

---

[9]Some courts have held that an insured seeking *indemnity* has the burden *at trial* of proving that a third party claim falls within the "sudden and accidental" exception to the pollution exclusion. (See, e.g., *Aeroquip Corp.* v. *Aetna Cas. and Sur. Co., Inc.* (9th Cir. 1994) 26 F.3d 893; *SCSC Corp.* v. *Allied Mut. Ins. Co.* (Minn. 1995) 536 N.W.2d 305, 313-314.) Those cases have no application where, as here, we are examining the *duty to defend* on an *insurer's motion for summary judgment.* In this context, the burden is on the insurer to conclusively establish through undisputed facts that there is no potential for coverage. (*Montrose Chemical Corp.* v. *Superior Court, supra,* 6 Cal.4th at p. 300; *Haskel, Inc.* v. *Superior Court* (1995) 33 Cal.App.4th 963, 976-977 [39 Cal.Rptr.2d 520].) Consequently, to prevail on summary judgment, American National had to prove as a matter of law that the discharge of pollutants was not sudden and accidental. (See *Vann* v. *Travelers Companies* (1995) 39 Cal.App.4th 1610, 1614-1618 [46 Cal.Rptr.2d 617]; see also *Certain Underwriters at Lloyd's of London* v. *Superior Court* (1997) 56 Cal.App.4th 952 [65 Cal.Rptr.2d 821].)

the soil and groundwater. Nothing is said about whether the pollutants were discharged suddenly or accidentally. Thus, the pleadings do not support American National's contention that it had no duty to defend. (See *Montrose Chemical Corp.* v. *Superior Court, supra*, 6 Cal.4th at p. 304 ["Although the CERCLA complaint did not specify whether [the insured] negligently or intentionally disposed of DDT process wastes—and therefore was, as the trial court observed, 'neutral' on the question of coverage—its allegations sufficed to raise the *possibility* that [the insured] would be liable for property damage covered by the policies." (Italics added.)].)

The extrinsic evidence is equally unconvincing. The four or five spills of 1-1-1 trichloroethane from 1979 to 1987 hardly constituted an "ordinary and/or intentional business practice[]," as stated in American National's letter denying coverage. Nor did they amount to a "[g]radual discharge or release of material," as found by the trial court. Arguably, they were sudden and accidental spills. Similarly, the occasional spills while emptying the degreaser and the few overflows from the plating tanks cannot be classified as gradual, intended, or expected discharges or releases. The same holds true for the chemicals dispersed when the fire department extinguished the May 1986 fire. Further, while we have an incomplete picture of the circumstances surrounding the leak from the punctured trough in 1984, the evidence suggests the possibility of a sudden and accidental release.[10]

We recognize that, hypothetically, some spills may occur with such frequency and similarity that they eventually become expected (i.e., not accidental). However, we cannot say as a matter of law that the spills at A-H Plating fell into that category. Accordingly, the evidence before the trial court did not negate American National's duty to provide a defense. (Cf. *Montrose Chemical Corp.* v. *Superior Court, supra*, 6 Cal.4th at pp. 304-305 ["[T]he fact that toxic discharges occurred over a lengthy period during which [the insured] operated its . . . facility does not, without more, establish that [the insured] expected or intended the property damage that allegedly resulted. . . . And the fact that [the insured's] regular business practices involved the disposal of DDT process wastes could not eliminate the possibility that at least some of the property damage might have resulted from accidental causes."].)

Putting aside the specific circumstances of the spills at A-H Plating, American National argues that A-H Plating "expected" *all* of the spills, as

---

[10]As to the spills of nickel, nitric acid, and sulfuric acid, the record provides very little information other than the fact that they occurred and were contained by berms. (See *ante*, at p. 436 & fn. 8.) The mere occurrence of such spills does not establish as a matter of law that they were gradual, expected, or intentional. Thus, the evidence allows for the possibility that the spills were sudden and accidental.

evidenced by the fact that the company had adopted measures to prevent, contain, and clean up spills. According to American National, A-H Plating's attempt to prevent and remediate spills indicates that it "expected" them to occur. Since the spills were "expected," they could not be "accidental." We disagree with this contention.

As stated, the pollution exclusion applies unless the discharge or release of contaminants was "sudden and accidental." A polluting event is "accidental" if it was "unexpected" and "unintended." (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co., supra,* 12 Cal.App.4th at p. 755.) An "unexpected" event, in turn, is one that the insured did not know or believe to be substantially certain or highly likely to occur. (See *id.* at pp. 746 & fn. 4, 748, 783-784.) As we see it, the mere fact that a company has made an effort to prevent a particular type of harm or to respond quickly to a potentially harmful incident does not automatically rule out the occurrence of "accidents."

All, if not most, companies have adopted safety measures to protect their employees. Often, those measures are required by law. (See, e.g., Lab. Code, § 6300 et seq. [California Occupational Safety and Health Act of 1973 (Cal-OSHA)].) Similarly, depending on the nature of the business, a company may have adopted procedures for the handling and disposal of hazardous substances. Those procedures may also be imposed by law. (See, e.g., Health & Saf. Code, § 25100 et seq. [Hazardous Waste Control Act]; *id.,* § 25531 et seq. [Hazardous Materials Management Act].) Of course, many companies go beyond the requirements of statutory law in seeking to protect their employees and the environment. Whether such safety measures are legally mandated or voluntarily adopted, we do not think their use necessarily means that the company knows or believes that a particular incident is substantially certain or highly likely to occur.

By way of example, many companies take measures to prevent, or diminish the impact of, a fire. They may install an interior sprinkler system; use smoke detectors, fire alarms, and nonflammable or flame-retardant building materials; post signs by elevators and stairwells indicating the means of exiting the building; and conduct fire drills. Yet, despite these measures, a fire could still start "accidentally." Surely a company's efforts to safeguard its personnel and facilities from fire damage do not lead inexorably to the conclusion that it "expects" a fire.

Moreover, American National's argument, if taken to its logical extreme, would render all accident-based insurance policies worthless. A company typically purchases a commercial general liability policy to provide some

means of protection against injury-producing events. Naturally, the company would not have obtained insurance in the first place unless it had "expected" such an event. An "expected" event cannot constitute an "accident." Thus, the insurance would provide no coverage at all. Plainly, we cannot accept this interpretation of "expect" since it would lead to absurd consequences.

By the same token, we fail to understand how an electroplating company "expects" a *particular* spill just because it has adopted procedures to prevent, contain, and clean up spills *in general*. By taking precautionary measures to protect the environment, a company does not eliminate the possibility of "accidents." We conclude that the circumstances surrounding a specific spill—such as its cause, its likelihood, its similarity to other spills, and the frequency of similar spills—must be examined to determine whether the company knew or believed that the spill was "expected" (i.e., substantially certain or highly likely to occur). Under this standard, we do not find as a matter of law that the spills at A-H Plating were "expected."

In reaching this result, we part company with *American States Ins. Co.* v. *Sacramento Plating, Inc.* (E.D.Cal. 1994) 861 F.Supp. 964, affirmed by memorandum opinion (9th Cir. 1996) 99 F.3d 1145. In that case, the insureds (the former and present owners of an electroplating facility) were required to remediate soil contamination pursuant to an order by the California Environmental Protection Agency (Cal-EPA). In response to the Cal-EPA order and related civil litigation, the insureds sought a defense and indemnity from their insurer. The insurer filed a declaratory relief action in federal district court, seeking a declaration that it had no duty to provide a defense or indemnity. In moving for summary judgment, the insurer argued that, under California law, there was no coverage in light of the policies' pollution exclusion. The insureds countered that coverage existed under the "sudden and accidental" exception to the exclusion. The district court rejected the insureds' position, finding that the leaks and spills had been "expected" because the owners had taken precautions to contain such discharges (e.g., by constructing berms). (861 F.Supp. at pp. 969-971.)

For the reasons discussed above, we reject the notion that an insured's attempt to reduce the risk of polluting the environment ipso facto renders the "sudden and accidental" exception inapplicable. Indeed, the purpose of the pollution exclusion is to provide an insured with "a strong incentive to take precautions designed to minimize the risk of environmental damage." (*New Castle County* v. *Hartford Acc. and Indem. Co.* (3d Cir. 1991) 933 F.2d 1162, 1202.)

As stated by one court, the "sudden and accidental" exception to the pollution exclusion is designed "to deny coverage for intentional polluters. The 'accidental' prong of the test already deals with such conduct. But even with an accidental requirement, insureds might engage in sloppy, although unintentional, waste disposal practices over a period of time. The temporal component of [a 'sudden' discharge or release] bolsters the goal of the accidental prong by providing insureds with the incentive to avoid careless long-term waste disposal practices. . . . 'By requiring a sudden cause of the discharge, the pollution exclusion provides insureds with the incentive *to take precautions against long-term conditions that may lead to pollution damage.'*" (*SnyderGeneral Corp.* v. *Century Indem. Co.* (N.D.Tex. 1995) 907 F.Supp. 991, 1002, affd. in part and vacated in part (5th Cir. 1997) 113 F.3d 536, italics added.)

"The policy reasons for the pollution exclusion are obvious: if an insured knows that liability incurred by all manner of negligent or careless spills and releases is covered by his liability policy, he is tempted to diminish his precautions and relax his vigilance. Relaxed vigilance is even more likely where the insured knows that the intentional deposit of toxic material . . . , so long as it is unexpected, affords him coverage. In th[at] case, it pays the insured to keep his head in the sand. [¶] . . . [P]utting the financial responsibility for pollution that may occur over the course of time upon the insured places *the responsibility to guard against such occurrences* upon the party with the most control over the circumstances most likely to cause the pollution." (*Waste Management* v. *Peerless Ins. Co.* (1986) 315 N.C. 688, 697-698 [340 S.E.2d 374, 381], italics added.)

Put simply, the pollution exclusion seeks to encourage an insured to take precautions against contaminating the environment. An insured who takes such precautions may nevertheless find potential coverage for spills and leaks under the exception to the pollution exclusion, depending upon the circumstances of the discharge or release of contaminants. To the extent that *American States Ins. Co.* v. *Sacramento Plating, Inc., supra*, 861 F.Supp. 964, holds otherwise, we decline to follow it.[11]

### 2. *Owned Property Exclusion*

 American National's policy excluded coverage for damage to property owned, occupied, or rented by the insured, used by the insured, or in the

---

[11]We agree with the alternative holding in *American States Ins. Co.* that the "sudden and accidental" exception to the pollution exclusion does not apply where an insured pollutes the environment as part of its regular business practice by repeatedly discharging contaminants in the same manner on a daily basis over several years. (See 861 F.Supp. at pp. 969, 971.) That is not the situation presented by American National's summary judgment motion.

care, custody, or control of the insured. Assuming that cleanup costs associated with an insured's property are typically excluded by such a policy provision (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co., supra,* 12 Cal.App.4th at p. 758; see *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 818, fn. 7 [274 Cal.Rptr. 820, 799 P.2d 1253]), we note that the third party complaints in this case alleged that groundwater had been contaminated. Further, the contaminated groundwater extended beyond the confines of A-H Plating's property.

It is well settled that the state and federal governments, not A-H Plating, own the groundwater. (See *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 817, fn. 6; *Intel Corp.* v. *Hartford Acc. & Indem. Co.* (9th Cir. 1991) 952 F.2d 1551, 1565; Wat. Code, § 102.) Accordingly, because there is no evidence that A-H Plating owned, occupied, rented, used, cared for, possessed, or controlled the groundwater, the owned property exclusion did not eliminate the *potential* for coverage. (See also *Vann* v. *Travelers Companies, supra,* 39 Cal.App.4th at pp. 1618-1619.)

Nonetheless, American National argues that the owned property exclusion precludes potential coverage because A-H Plating did not, in fact, contaminate any groundwater. American National contends that its investigation absolved A-H Plating of any wrongdoing in that regard. Put another way, American National has concluded that A-H Plating is not liable for the misconduct alleged in the third party complaints.

■ However, an insurer cannot avoid the duty to defend merely by concluding, based on its own investigation, that the insured has done no wrong. The duty to defend does not evaporate simply because the insurer has decided that the insured will ultimately be exonerated (or because evidence supporting that conclusion has been introduced in a declaratory relief action over coverage). Indeed, the duty of defense, as expressly described in the insurance policy, covers third party claims that are "groundless, false or fraudulent." Thus, American National's unilateral determination that the third party claims are "groundless, false, or fraudulent" did not relieve it of the duty to provide a defense. Its contrary assertion ignores the distinction between the duty to defend and the duty to indemnify: "[T]he duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. . . ." (*Montrose Chemical Corp.* v. *Superior Court, supra,* 6 Cal.4th at p. 295.) Moreover, regardless of the strength of American National's belief about A-H Plating's lack of exposure, the trier of fact in the third party actions may reach a different conclusion. In short, an insurer's determination that an insured is not liable on a third party claim does not provide a basis for

escaping the duty to defend. That duty extends to those insureds whom the insurer believes to be innocent of the conduct alleged in the third party complaint.[12]

Once again, *American States Ins. Co.* v. *Sacramento Plating, Inc.*, *supra*, 861 F.Supp. 964, is at odds with our conclusion. There, the court held that an insurer is entitled to summary judgment on the duty to defend unless the insured can establish that it actually contaminated the property at issue in the third party litigation. (See *id.* at p. 971 [granting summary judgment to insurer because ". . . there is no evidence that these incidents, even if 'sudden and accidental,' caused the soil contamination"].) However, such a rule is contrary to the principles established in *Montrose Chemical Corp.* v. *Superior Court*, *supra*, 6 Cal.4th 287, with respect to the duty to defend and the insurer's burden of proof in summary judgment proceedings. (See also fn. 9, *ante*.)

In sum, American National did not establish as a matter of law that there was no potential coverage for the third party claims. The trial court therefore erred in ruling that American National did not owe A-H Plating a duty of defense.[13]

B.-D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[12]In any event, American National failed to establish as a matter of law that A-H Plating did not contaminate the groundwater. It relied on two sources of information in attempting to prove otherwise. First, A-H Plating's president, Peter Waschak, had stated that Lockheed's allegations were meritless. However, Waschak's statement was an expression of opinion, and it did not disprove Lockheed's allegations. Second, American National relied on an environmental assessment report by Law Environmental, Inc., dated September 27, 1988. Although the report discussed soil contamination, it offered no conclusion about groundwater contamination and expressly noted that groundwater samples had not been taken.

[13]In seeking summary judgment, American National argued that A-H Plating had not pleaded its own performance under the policy. Not so. The first amended complaint stated that "[p]laintiffs have performed all covenants and conditions required under the American National policy . . . . All premiums due . . . have been paid in full." (See Code Civ. Proc., § 457 ["In pleading the performance of conditions precedent in a contract, it is not necessary to state the facts showing such performance, but it may be stated generally that the party duly performed all the conditions on his part, and if such allegation be controverted, the party pleading must establish, on the trial, the facts showing such performance."].) Nothing in American National's motion indicates that, at trial, A-H Plating will be unable to prove that it satisfied all conditions precedent.

*See footnote, *ante*, page 427.

## DISPOSITION

The judgment is reversed. Appellant A-H Plating, Inc., is entitled to costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.