Opinion by Judge SCHROEDER; Dissent by Judge BEA.
SCHROEDER, Circuit Judge:
In 2001, Barry Bonds hit 73 home runs for the San Francisco Giants. Also in 2001, as well as in prior and succeeding years, BALCO Laboratories, Inc. in San Francisco recorded, under the name “Barry Bonds,” positive results of urine and blood tests for performance enhancing drugs. In 2003, Bonds swore under oath he had not taken performance enhancing drugs, so the government is now prosecuting him for perjury. But to succeed it must prove the tested samples BALCO recorded actually came from Barry Bonds. Hence, this appeal.
*498 The government tried to prove the source of the samples with the indisputably admissible testimony of a trainer, Greg Anderson, that Barry Bonds identified the samples as his own before giving them to Anderson, who took them to BAL-CO for testing. Anderson refused to testify, however, and has been jailed for contempt of court.
The government then went to Plan B, which was to offer the testimony of the BALCO employee, James Valente, to whom Anderson gave the samples. Valente would testify Anderson brought the samples to the lab and said they came from Barry Bonds. But the district court ruled this was hearsay that could not be admitted to establish the truth of what James Valente was told. See Fed.R.Evid. 802. Accordingly we have this interlocutory appeal by the United States seeking to establish that the Anderson statements fall within some exception to the hearsay rule.
The district court also ruled that because Anderson’s statements were inadmissible, log sheets on which BALCO recorded the results of the testing under Bonds’ name, were also inadmissible to prove the samples were Bonds’. The government challenges that ruling as well.
We have jurisdiction pursuant to 18 U.S.C. § 3731 which authorizes government interlocutory appeals of adverse evidentiary rulings. We review for abuse of discretion and affirm.
I. Background
BALCO Laboratories, Inc. was a California corporation that engaged in blood and urine analysis, and was located in San Francisco. In 2003, the IRS began to investigate BALCO, suspecting the company of first, distributing illegal performance enhancing drugs to athletes, and then, laundering the proceeds. In September 2003, the government raided BALCO and discovered evidence which it contends linked both trainer Greg Anderson (“Anderson”) and BALCO to numerous professional athletes. One of these athletes was professional baseball player and Defendant Barry Bonds (“Bonds”). The government also found blood and urine test records which, it asserts, established that Bonds tested positive for steroids.
On multiple occasions Anderson took blood and urine samples to BALCO Director of Operations James Valente (“Valente”) and identified them as having come from Bonds. According to Valente, when he received a urine sample from Bonds, he would assign the sample a code number in a log book, and then send the sample to Quest Diagnostics (“Quest”) for analysis. Quest would send the result back to BAL-CO. BALCO would then record the result next to the code number in the log book. Also, according to Valente, BALCO would send Bonds’ blood samples to LabOne & Specialty Lab (“LabOne”) for analysis. The government seized the log sheets from BALCO, along with the lab test results.
Before the grand jury in the probe of BALCO, the questioning by the government focused extensively on the nature of Bonds’ relationship with Anderson. Bonds testified that he had known Anderson since grade school, although the two had lost touch between high school and 1998. In 1998, Anderson started working out with Bonds and aiding him with his weight training. Anderson also provided Bonds with substances including “vitamins and protein shakes,” “flax seed oil,” and a “cream.” According to the government, some or all of these items contained steroids. Anderson provided all of these items at no cost to Bonds. Bonds testified he took whatever supplements and creams Anderson gave him without question because he trusted Anderson as his friend. *499 (“I would trust that he wouldn’t do anything to hurt me.”). Bonds stated that he did not believe anything Anderson provided him contained steroids. He specifically denied Anderson ever told him the cream was actually a steroid cream.
With respect to blood sample testing, Bonds testified before the grand jury that Anderson asked Bonds to provide blood samples on five or six occasions, telling Bonds he would take the blood to BALCO to determine any nutritional deficiencies in his body. Bonds said that he would only allow his own “personal doctor” to take the blood for the samples.
Bonds also testified he provided around four urine samples to Anderson and he believed the urine samples were also going to be used to analyze his nutrition. Anderson also delivered these samples to Yalente at BALCO for analysis. (“Greg went [to BALCO] and dealt with it.”). Bonds did not question Anderson about this process because they “were friends.”
The government showed Bonds numerous results of blood and urine tests but Bonds denied ever having seen them before. Rather Bonds contended that Anderson verbally and informally relayed the results of any tests to him. Bonds stated that Anderson told him that he tested negative for steroids. (“Greg just said: “You’re — you’re negative.”). Bonds trusted what Anderson told him. (“He told me everything’s okay. I didn’t think anything about it.”).
With respect to the relationship between Bonds and Anderson, Bonds admitted to paying Anderson $15,000 a year for training. Bonds stated that this payment was not formally agreed to. Rather, Bonds contended that he “felt guilty” and “at least [wanted to give Anderson] something.” (“Greg has never asked me for a penny.”). Bonds had several trainers and considered some of the trainers employees, but considered Anderson a friend whom he paid for his help. (“Greg is my friend____ Friend, but I’m paying you.”). Bonds made his payments to Anderson in lump sums. In 2001, the year he set the Major League Baseball single season home run record, Bonds also provided Anderson, along with other friends and associates, a “gift” of $20,000. Bonds spent considerable time with Anderson in San Francisco but Bonds noted that Anderson only visited during weekends during spring training.
On February 12, 2004, a grand jury indicted Anderson and other BALCO figures for their illegal steroid distribution. Anderson pled guilty to these charges and admitted to distributing performance enhancing drugs to professional athletes. The government also commenced an investigation into whether Bonds committed perjury by denying steroid use during his grand jury testimony. Anderson, since that time, has continuously refused to testify against Bonds or in any way aid the government in this investigation and has spent time imprisoned for contempt.
II. Procedural History of this Appeal
On December 4, 2008, the government indicted Bonds on ten counts of making false statements during his grand jury testimony and one count of obstruction of justice. They included charges that Bonds lied when he 1) denied taking steroids and other performance enhancing drugs, 2) denied receiving steroids from Anderson, 3) misstated the time frame of when he received supplements from Anderson.
The next month, in January 2009, Bonds filed a motion in limine to exclude numerous pieces of evidence the government contends link Bonds to steroids. As relevant to this appeal Bonds moved to exclude two principal categories of evidence: the labo *500 ratory blood and urine test results, and the BALCO log sheets of test results.
When the government sought to introduce as business records the lab test results from Quest (urine) and LabOne (blood) seized from BALCO, Anderson’s refusal to testify created an obstacle. The essence of the government’s identification proof was Anderson’s identification of the samples to Valente as Bonds’. The government wanted to introduce Valente’s testimony that Anderson told him for each sample that “This blood/urine comes from Barry Bonds,” in order to provide the link to Bonds. Because the government was attempting to use Anderson’s out of court statements to prove the truth of what they contained, Bonds argued that Anderson’s statements were inadmissible hearsay and that the lab results could not be authenticated as Bonds’ in that manner. See Fed. R.Evid. (“FRE”) 802 (“Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress.”).
The government sought to fit the statements within a hearsay exception. In its response to the defense motion in limine the government countered that Anderson’s statements were admissible as statements against Anderson’s penal interest (FRE 804(b)(3)), as statements of a co-conspirator (FRE 801(d)(2)(E)), and, alternatively, as admissible under the residual exception (FRE 807). At oral argument and in supplemental briefing before the district court, the government advanced two additional rationales as to how the court could admit the blood and urine samples: as statements authorized by a party (Anderson’s statements authorized by Bonds) under FRE 801(d)(2)(C), or as statements of an agent (Anderson as Bonds’ agent) under FRE 801(d)(2)(D). The court held that the government, as the proponent of hearsay, had failed to prove by a preponderance of the evidence that any of the exceptions or exemptions applied. See Bourjaily v. U.S., 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (holding that proponent of hearsay must prove exception or exemption by preponderance of the evidence).
The government also sought to introduce the log sheets from BALCO containing the Quest lab test results showing Bonds’ urine testing positive for steroids, arguing that the log sheets were admissible as non-hearsay business records, or as statements of a conspirator, as statements against penal interest, or admissible under the residual exception to hearsay. The district court ruled the log sheets were also inadmissible to establish the samples tested were Bonds’. This appeal followed. On appeal, the government argues only that FRE 807, the residual exception, or FRE 801’s exceptions for authorized statements (d)(2)(C) or for statements by an agent (d)(2)(D) apply.
III. Discussion
A. Admissibility of Anderson’s Statements Under the Residual Exception to the Hearsay Rule
The district court held that FRE 807, the residual exception, did not apply. The court observed that it was designed for “exceptional circumstances.” See Fong v. American Airlines, 626 F.2d 759, 763 (9th Cir.1980). FRE 807, previously FRE 803(24), provides:
A statement specifically not covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the pro *501 ponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will be served admission of the statement into evidence.
The court did not find Anderson’s refusal to testify an exceptional circumstance because the effect was to make him an unavailable declarant, and FRE 804 already defines an “unavailable” declarant and lists exceptions to inadmissibility that the government does not contend are applicable in this case.
FRE 807 involves discretion. It exists to provide judges a “fair degree of latitude” and “flexibility” to admit statements that would otherwise be hearsay. See U.S. v. Valdez-Soto, 31 F.3d 1467, 1471 (9th Cir.1994).
Our sister circuits have also given district courts wide discretion in the application of FRE 807, whether it be to admit or exclude evidence. See, e.g., U.S. v. Hughes, 535 F.3d 880, 882-83 (8th Cir.2008) (upholding district court decision not to admit evidence under FRE 807); FTC v. Figgie Intern. Inc., 994 F.2d 595, 608-09 (9th Cir.1993) (upholding admission under residual exception even where trial court failed adequately to explain reasoning). Our research has disclosed only one instance where a circuit court reversed a district court to require admission of a statement under FRE 807. See U.S. v. Sanchez-Lima, 161 F.3d 545, 547-48 (9th Cir.1998). However, the hearsay statements in that case were videotaped and under oath, and thus had indicators of trustworthiness that Anderson’s statements do not. See id. More important, the circumstances were “exceptional” because the government had deported the witnesses, so the statements remained the only way the defendants could present their defense. Therefore, the government is asking this Court to take an unprecedented step in using 807 to admit the statements of a declarant who has chosen not to testify and whose statements lack significant indicators of trustworthiness.
The government argues that the district court adopted an improperly narrow view of FRE 807 by not taking into account that Anderson’s statements “almost” fell within several other hearsay exceptions. It also asserts the court did not give enough weight to Anderson’s unavailability.
The government contends that Anderson’s statements “almost” met several other hearsay exceptions, and for that reason the district court erred in not admitting them under FRE 807. Specifically the government points out that Anderson’s statements came close to qualifying as statements against his penal interest and statements of a coconspirator. The govT ernment relies on Valdez-Soto. In upholding the admission of out of court statements under the 807 exception in Valdez-Soto, we said that where a statement “almost fit[s]” into other hearsay exceptions, the circumstance cuts in favor of admissibility under the residual exception. See 31 F.3d at 1471. We did not, however, hold the factor was determinative, only that it supported the district court’s application of FRE 807 in that case to admit the evidence. In this case, even though this was a “near miss” it was nevertheless a “miss” that may have permitted, but did not alone compel the trial court to admit Anderson’s statements under FRE 807.
The government next suggests that Anderson’s unavailability is “exactly the type of scenario” FRE 807 was intended to remedy, but cites no authority supporting the proposition. It argues the district court misunderstood the rule and applied it too narrowly. The district court, however, correctly noted that courts use FRE 807 only in exceptional circumstances and *502 found this situation unexceptional because it involves statements of an unavailable witness like those FRE 804 excludes, with limited exceptions here not applicable.
In addition, FRE 807 requires that the admissible statements have trustworthiness. The district court concluded Anderson’s statements were untrustworthy, in major part because Valente admitted that he once mislabeled a sample when Anderson asked him to do so. To the extent the government contends that the district court improperly focused on Valente’s trustworthiness instead of on the trustworthiness of Anderson’s statements, the government misinterprets the district court’s opinion. The district court finding properly focused on the record of untrustworthiness of the out of court declarant, Anderson, as required under the rule. There was support for its conclusion that Anderson’s statements about the source of samples were not trustworthy.
B. Admissibility of Anderson’s Statements Under 801(d)(2)(C) and (D).
FRE 801(d)(2)(C) provides that a statement is a non-hearsay party admission if it “is offered against a party and is ... a statement by a person authorized by the[defendant] to make a statement concerning the subject.” FRE 801(d)(2)(D) provides that a statement is not hearsay if it “is offered against a party and is ... a statement by the party’s agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.” Subsection (C) thus requires the declarant to have specific authority from a party to make a statement concerning a particular subject. Subsection (D) authorizes admission of any statement against a party, but only provided it is made within the scope of an employment or agency relationship.
As a threshold matter, Bonds contends that the government did not preserve its arguments under either subsection, because the government failed to timely raise the issues in its response to the defense motion in limine to exclude the statements; the government raised them for the first time in oral argument on the motion in the district court, and then filed a supplemental brief. Bonds cites U.S. v. Chang, 207 F.3d 1169 (9th Cir.2000), but Chang does not support Bonds’ position. Chang states that if “a party fails to state the specific grounds upon which evidence is admissible, the issue is not preserved for review, and the court will review only for plain error.” 207 F.3d at 1176 (citation omitted). Chang would bar a party from arguing for admissibility an appeal when it gave no justification under the rules to support admissibility in the district court. Chang further suggests a party can not contend on appeal that admissibility would have been proper under a different rule from that advocated in the district court. In this case, however, the government argued the points and the district court allowed the government and Bonds to file supplemental briefs to address the new contentions. They are not raised for the first time on appeal. Although the government’s brief contained little factual information explaining the extent and nature of Bonds’ relationship with Anderson, and that doubtless contributed to the district court’s adverse ruling on the merits, the government preserved the right to appeal the district court’s ruling that Subsections C and D did not apply.
We turn first to the government’s challenge to the district court ruling that the statements should not be admitted under Subsection (C) because Bonds did not specifically authorize Anderson to make the statements. Both parties agree that if the samples were Bonds’, he could *503 have authorized Anderson to make the statements. The question is whether the district court was within its discretion in ruling the record failed to establish sufficiently that he did.
The government acknowledges it cannot establish that Bonds explicitly authorized Anderson to identify the samples as his. Bonds was never asked the question during his grand jury testimony and Anderson, of course, is unavailable. The government’s position is, in essence, that by authorizing Anderson to act as one of his trainers, Bonds implicitly authorized Anderson to speak to the lab on his behalf. The conclusion does not follow from the premise.
The district court correctly observed that certain relationships do imply an authority to speak on certain occasions. See e.g., Hanson v. Waller, 888 F.2d 806, 814 (11th Cir.1989) (stating that lawyers have implied authority to speak outside of court on matters related to the litigation). Athletic trainers, however, as the district court went on to observe, do not traditionally have such any such implicit authorization to speak. The government suggests that by allowing Anderson to have the samples tested, Bonds impliedly authorized Anderson to identify them to BALCO, citing United States v. Iaconetti, 540 F.2d 574, 576-77 (2d Cir.1976). In Iaconetti, the defendant demanded a bribe from the president of a company. Id. The court held that by demanding the bribe, the defendant had provided implicit authorization for the president to discuss the bribe with his business partner. Id. Here, Bonds provided the samples after Anderson asked for them and thus Iaconetti does not apply. There is no evidence of discussions about how Anderson was to deal with the samples. The district court could have quite reasonably concluded that Bonds was accommodating the wishes of a friend rather than providing Anderson with “the authority to speak” on his behalf.
We cannot agree with the dissent’s assertion that the nature of the task of testing blood and urine samples implies that the person who makes the necessary arrangements for the testing and delivers the samples is authorized to identify the samples’ origin. Even assuming that Bonds allowed Anderson to have his blood and urine tested in order to obtain medical information rather than to accommodate Anderson’s wishes, it was not necessary for Anderson to reveal Bonds’ identity to accomplish that purpose. The samples could easily have been identified by a number or a code word. Indeed, there are many legitimate reasons to perform medical testing anonymously. The dissent’s conclusion that Anderson was impliedly authorized to identify Bonds depends on the assumption that identifying Bonds by name was the only way to ensure accurate test results. Because we disagree with that assumption, we do not find the dissent’s reasoning persuasive.
The district court also expressly found that the government had failed to carry its burden of showing that Bonds had provided Anderson the authority to identify the samples on each particular occasion, because Bonds could not remember how many samples he had provided. (“[Bonds’] equivocal answers about the number of samples he gave Anderson are not sufficiently certain to establish that Anderson had authority to speak with regard to the particular samples at issue here.”). The district court thus concluded Bonds’ lack of memory about the number of samples militated against his having conferred on Anderson authority to speak for each disputed sample in the case. Contrary to the government’s theory, the court was not suggesting Bonds should have had a perfect memory.
*504 The government also focuses on a district court remark suggesting that to be admissible under Subsection C, the statements had to have been against Anderson’s penal interest. The government is correct that had they been against Anderson’s penal interest they may have been admissible under a different subsection of 801, but such a requirement does not appear in Subsection C. The district court may have misstated Subsection C’s provision i.e., that the statement be “offered against a party,” which these statements were, and incorrectly suggested the statements had to qualify as admissions against the penal interest of Anderson, which these statements were not. Any such misstatement had no bearing on the court’s ruling, however, because the court clearly ruled that the government failed to show the statements were authorized by Bonds.
It thus applied the correct standard. A tangential misstatement does not transform the ruling into error. There was no abuse of discretion in the court’s refusing to admit the statements, under FRE 801(d)(2)(C), as statements authorized by Bonds. We now turn to whether the statements, though not specifically authorized, came within the scope of an agency or employment relationship that permitted their admission under FRE 801(d)(2)(D). That provision makes admissible “a statement by the party’s agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.” The district court rejected the government’s contention that Anderson’s statements to Valente are admissible under this provision. Again, we may reverse only for abuse of discretion. U.S. v. 4.85 Acres of Land, 546 F.3d 613, 617 (9th Cir.2008).
To determine whether Anderson’s statements are admissible under Rule 801(d)(2)(D), we must “undertake a fact-based inquiry applying common law principles of agency.” NLRB v. Friendly Cab Co., Inc., 512 F.3d 1090, 1096 (9th Cir.2008). For Anderson’s statements to fall under this exception, he would have to have been Bonds’ employee or agent.
The government provides two arguments in favor of admissibility of Anderson’s statements under Rule 801(d)(2)(D). First, it argues that the district court erred in finding that, as a general matter, Anderson’s work as a trainer was not that of an employee or agent. Next, it contends that even if Anderson did not generally act as an employee or agent, he assumed the status of an agent for the purpose of delivering Bonds’ blood and urine to BALCO. We cannot accept either argument.
The record supports the district court’s conclusion that Anderson was an independent contractor, rather than an employee. The parties briefed this issue under the Second Restatement of Agency, which sets forth ten factors that a court should consider: 1) the control exerted by the employer, 2) whether the one employed is engaged in a distinct occupation, 3) whether the work is normally done under the supervision of an employer, 4) the skill required, 5) whether the employer supplies tools and instrumentalities, 6) the length of time employed, 7) whether payment is by time or by the job, 8) whether the work is in the regular business of the employer, 9) the subjective intent of the parties, and 10) whether the employer is or is not in business. Restatement (Second) Agency § 220(2) (1958). Although the parties presented this issue primarily under the Second Restatement, we have independently reviewed the Third Restatement, which abandons the term independent contractor. See Restatement (Third) Agency § 1.01 cmt. c. We find nothing in the later Re *505 statement’s provisions that would materially change our analysis or cause us to reach a different result than the district court.
In applying the Second Restatement factors, a court will look to the totality of the circumstances, but the “essential ingredient ... is the extent of control exercised by the employer.” Friendly Cab, 512 F.3d at 1096 (internal quotation marks and citation omitted). Virtually none of the Second Restatement factors favor the existence of an employment relationship in this case. Most important, there is no evidence that Bonds directed or controlled any of Anderson’s activities. To the contrary, the facts on record regarding the Bonds-Anderson relationship evidence a lack of control exercised by Bonds. For example, Anderson seemingly had free reign to provide Bonds whatever muscle creams and supplements he felt appropriate. Bonds took these items without question on the basis of his friendship with Anderson. Rather than exercise control over Anderson’s training program, Bonds testified that he had a “Dude, whatever” attitude to Anderson’s actions. These facts make it clear that Anderson was, as the district court found, not an employee.
Other elements of the Second Restatement test also point to Anderson’s acting as an independent contractor, not an employee. For example, Anderson provided his own “instrumentalities” and “tools” for his work with Bonds. See Restatement (Second) Agency § 220(2)(e). All of the aforementioned creams and supplements came from Anderson, not Bonds. There is no evidence that Bonds supplied any type of equipment or material related to Anderson’s training regimen. As a trainer, Anderson was engaged in a “distinct occupation.” See id. § 220(2)(b). He had many different clients and offered his services to others during the same period. Moreover, it is important in this context that Bonds testified that he considered Anderson a friend and not an employee. See id. § 220(2)(i) (noting subjective intent of parties relevant to determining whether one is an independent contractor).
The government is correct that certain, but limited, aspects of the Bonds-Anderson relationship may suggest an employer/employee relationship. For example, Bonds conceded that he paid Anderson annually, and not “by the job.” See id. § 220(2)(g). Yet Bonds paid gratuitously, and not on the basis of any regular employment relationship. There is, thus, sufficient basis in the record to support the district court’s conclusion that Anderson acted as an independent contractor rather than an employee.
Unlike employees, independent contractors are not ordinarily agents. See Dearborn v. Mar Ship Operations, Inc., 113 F.3d 995, 998 n. 3 (9th Cir.1997) (recognizing that “an independent contractor ... may be an agent” in limited circumstances in which he acts “subject to the principal’s overall control and direction”). The district court was therefore correct to conclude that “independent contractors do not qualify as agents for the purposes of Rule 801(d)(2)(D)” in the sense that evidence of an independent contractor relationship is insufficient in itself to establish an agency relationship for the purposes of the rule. See Merrick v. Farmers Ins. Group, 892 F.2d 1434, 1440 (9th Cir.1990) (holding that statements of independent contractors were not admissible under Rule 801(d)(2)(D) when there was no showing that the contractors were also agents). However, a finding that a speaker is an independent contractor does not preclude a finding that the speaker is also an agent for some purposes.
The dissent thus incorrectly suggests the district court’s ruling was the result of an incorrect application of a legal stan *506 dard. We have of course observed many times that a district court abuses its discretion when it makes an error of law. See, e.g., Yokoyama v. Midland Nat. Life Ins. Co., 594 F.3d 1087, 1091 (9th Cir.2010) (citing cases); U.S. v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir.2009) (en banc). In this case, however, the district court did not base its ruling on a legal determination that independent contractors can never be agents. Rather the district court held that the government had not shown that the task of identifying Bonds’ samples was within the scope of any agency relationship.
Accordingly, we must now address the government’s argument that even if Anderson was an independent contractor, he acted as an agent in delivering Bonds’ blood and urine to BALCO. An agent is one who “act[s] on the principal’s behalf and subject to the principal’s control.” Restatement (Third) Agency § 1.01. To form an agency relationship, both the principal and the agent must manifest assent to the principal’s right to control the agent. Id.
As is clear from the above description of Anderson’s and Bonds’ relationship, Anderson did not generally act subject to Bonds’ control in his capacity as a sometime trainer, nor did he or Bonds manifest assent that Bonds had the right to control Anderson’s actions as a trainer. There is no basis in the record to differentiate between Anderson’s actions in his capacity as a trainer and his conduct in delivering the samples to BALCO. There is little or no indication that Bonds actually exercised any control over Anderson in determining when the samples were obtained, to whom they were delivered, or what tests were performed on them. Nor, contrary to the dissent’s assertion, is there any indication that either Bonds or Anderson manifested assent that Bonds would have the right to instruct Anderson in these respects. It was Anderson who proposed to Bonds that he have his blood and urine tested. Bonds provided samples to Anderson when requested by the latter, and according to Bonds’ testimony, “didn’t think anything about it” after doing so. It was, further, Anderson who selected BALCO as the location for testing. In short, it was Anderson who defined the scope of the testing. Bonds provided Anderson no guidance or direction in terms of what specific tests BALCO would run on the samples. Bonds did not even inquire into the results of the tests. Rather, Anderson would, apparently on his own initiative, inform Bonds of results. The dissent says that Bonds instructed Anderson to deliver the samples to BALCO within 30 minutes of extraction, but this is not correct. The record shows that it was Anderson who told Bonds about the 30-minute time constraint. Moreover, the samples were taken at Bonds’ house not because Bonds so ordered, but because his house was close to BALCO and taking the samples there made it possible for them to be delivered in time. Bonds quite understandably would allow only his own doctor to take the samples, but this does not show that he also had reserved the right to instruct Anderson as to what to do with the samples. See Restatement (Third) of Agency § 1.01 cmt. f (stating that the fact that a service recipient imposes some constraints on the provision of services does not itself mean that the recipient has a general right to instruct and control the provider).
While the dissent focuses on whether, as a practical matter, Bonds had the “capacity” to assess Anderson’s performance and give Anderson instructions as to how to have the testing performed, it ignores the key question: whether Bonds and Anderson ever agreed that Bonds could do so. These are very different inquiries. Any time one person does something for *507 another, the latter is in all likelihood capable of evaluating and instructing the first. The Restatement provision on which the dissent relies makes it clear, however, that not all service providers and recipients stand in agency relationships. Restatement (Third) of Agency § 1.01 cmt f Rather, as we have seen, an agency relationship exists only if both the provider and the recipient have manifested assent that the provider will act subject to the recipient’s control and instruction. Id. The question whether Bonds had the ability, in a practical sense, to prevent Anderson from having the testing carried out similarly fails to resolve the question whether Anderson was Bonds’ agent. Obviously Bonds could have put an end to the testing by refusing to provide Anderson with samples of his blood and urine, but that does not establish an agency relationship. There is nothing in the record that requires a finding that Bonds actually controlled Anderson with respect to the testing or that Bonds and Anderson had agreed that Anderson would be obligated to follow Bonds’ instructions if Bonds chose to provide them. Contrary to the dissent’s contention, we do not maintain there needs to be an explicit agreement, but there must be at least some manifestation of assent to the principal’s right to control. Here, the testing was performed on Anderson’s own initiative and not at the request of Bonds. The dissent incorrectly assumes otherwise. Thus, the district court did not abuse its discretion in finding that Anderson was not an agent for the limited purpose of the drug testing.
The dissent incorrectly suggests our holding somehow conflicts with Harris v. Itzhaki, 183 F.3d 1043 (9th Cir.1999) and U.S. v. Jones, 766 F.2d 412 (9th Cir.1985). Itzhaki was a Fair Housing Act case in which we held that the jury, as trier of fact, should decide whether discriminatory statements were made by an agent of the defendant. Id. at 1054. That case has no relevance to the finding of a district court on a motion in limine. Our discussion is also fully consistent with Jones. There we found the district court did not abuse its discretion in admitting statements of ‘bag men’ in an extortion scheme. Jones, 766 F.2d at 415. Jones has no application to this case. The fact that this court deferred to a district court’s decision to admit evidence in Jones does not compel us to refuse to defer to a district court’s decision here and to admit Anderson’s statements. Moreover, in this case the government was required to demonstrate that Anderson was an agent by a preponderance of the evidence. See Bourjaily, 483 U.S. at 175, 107 S.Ct. 2775. The applicable burden of proof was lower at the time the court decided Jones. See 766 F.2d at 415 (“Evidence of agency must be substantial, although proof by a preponderance is not necessary.”).
To the extent that the dissent looks beyond the relevant time period to rely on a claim that on May 28, 2003, Bonds “asked Anderson to have Bonds tested for steroids to protect himself against false test results,” the claim is both irrelevant and misleading. The government’s arguments on appeal pertain to lab results from 2001 and 2002. What Bonds asked Anderson to do in 2003, is not relevant. The statement is misleading because the record only shows that, on that date, after being required to submit to a steroids test by Major League Baseball, Bonds told Anderson that he was suspicious of the test and that he “want[ed] to know what baseball’s doing behind our backs.” The dissent infers from this that Bonds must have asked Anderson to verify the test results by having BALCO independently test Bonds for steroids, but this is not the only possible interpretation of Bonds’ testimony. In any event, it sheds no light on *508 the nature of Bonds’ and Anderson’s relationship with respect to the tests performed in 2001 and 2002.
Although the district court might, in the exercise of its discretion, have reached a different decision, our standard of review is deferential, and we cannot say here that we are left with a “definite and firm conviction” that it made a “clear error in judgment” in ruling that Rule 801(d)(2)(D) did not apply. 4.5 Acres of Land, 546 F.3d at 617. There was no abuse of discretion.
C. The Log Sheets
The district court excluded BAL-CO log sheets purportedly showing Bonds testing positive for steroids “because even if [the log sheets] qualify as business records, they are not relevant because the government cannot link the samples to [Bonds] without Anderson’s testimony.” The parties spar about whether this statement by the district court meant relevance in the literal sense that they did not on their face pertain to Bonds, or whether the district court meant they could not in fact relate to Bonds unless the data was authenticated as relating to Bonds. The district court meant the latter.
The log sheets were business records reflecting that BALCO recorded test results in the name of Barry Bonds. The records themselves, however, go no further toward showing the actual samples came from Barry Bonds than Valente’s testimony about what Anderson told him. If anything the logs, when offered for the truth of the identification of the sample donor, created an additional level of hearsay rather than removing one. The district court did not abuse its discretion in refusing to admit the log sheets as evidence that the samples listed were Bonds’.
IV. Conclusion
The district court’s evidentiary rulings are AFFIRMED and the case is remanded for further proceedings consistent with this opinion.