COUNTY OF STANISLAUS, Plaintiff,

v.

TRAVELERS INDEMNITY COMPA-
NY; and Does 1 Through 50, In-
clusive, Defendant.

CIV. NO. 1:14-00666 WBS SMS

United States District Court,
E.D. California.

Signed November 5, 2015

Benjamin Perkins Syz, Janet Menacher, Brown & Winters, Cardiff, CA, for Plaintiff.

Lori A. Schweitzer, Scott M. Bloom, Linda I. Yen, Becherer Kannett & Schweitzer, Emeryville, CA, for Defendant.

## MEMORANDUM AND ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

WILLIAM B. SHUBB, UNITED STATES DISTRICT JUDGE

This action seeks to resolve disputes regarding the coverage due under a comprehensive general liability policy issued to plaintiff County of Stanislaus by the Insurance Company of the Pacific Coast, which was a former entity of defendant Travelers Indemnity Company. Pursuant to Federal Rule of Civil Procedure 56, both parties move for summary judgment to resolve defendant's obligations under the policy.

I. Factual and Procedural Background

From 1970 until 1990, plaintiff operated the Greer Landfill in the eastern edge of the San Joaquin Valley adjacent to the Tuolumne River. (Docket No. 28-13.) The Greer Landfill, which closed in 1995, contains approximately 4.5 million tons of residential, commercial, industrial, construction, and demolition waste that was deposited into excavated cells in the ground. (Id.) The policy at issue in this case was in effect from only October 13, 1972 to October 13, 1975. (Docket No. 28-8.) The policy excludes coverage for contamination, but reinstates coverage for "sudden and accidental" discharges. (Id.)

In 1985, groundwater degradation was identified at the landfill and efforts have been undertaken to remediate the groundwater contamination since at least 1991. (Docket No. 28-13.) In 2009, the California Regional Water Quality Control Board ("CRWQCB") issued an order identifying plaintiff's "Waste Discharge Requirements." (Id.) Finding that the "extent of the groundwater contamination has not been defined" and that the existing "landfill gas and groundwater extraction systems are not adequate," the CRWQCB issued a Cease and Desist Order in 2011. (Docket No. 32-3 at STATRAV2316-STA-TRAV2318.)

On August 5, 2011, plaintiff initiated an action in state court against the City of Modesto (the "City") seeking damages against the City based on contamination at the Greer Landfill. On August 24, 2011, the City filed a Cross-Complaint against plaintiff seeking indemnity and damages incurred as a result of the contamination. Plaintiff informed defendant of its lawsuit against the City five months after filing it and then tendered the defense of the City's Cross-Complaint on January 27,

2012. (Barillari Decl. ¶¶ 3, 5 (Docket No. 28-7).) Defendant accepted the tender subject to a complete reservation of rights and informed plaintiff that the "defense may be conducted by appropriately qualified counsel of the County of Stanislaus's choice, in any manner deemed appropriate to protect the interests of the County." (Docket No. 28-15.)

While defendant has paid legal fees incurred in defending against the City's Cross-Complaint, it has not paid any of the non-legal environmental consultant invoices plaintiff submitted. Plaintiff initiated this action in state court seeking declaratory relief to resolve defendant's obligations under the policy and alleging claims for breach of contract and breach of the implied covenant of good faith and fair dealing. (Docket No. 1.) Defendant removed the action to federal court, and the parties now seek summary judgment resolving whether defendant has a duty to defend plaintiff and, if so, whether the non-legal environmental consultant costs are defense costs.

## III. Analysis

### A. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S.Ct. 2548 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252, 106 S.Ct. 2505.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. Id. at 255, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge... ruling on a motion for summary judgment...." Id. On cross-motions for summary judgment, the court "must review the evidence submitted in support of each cross-motion [in a light most favorable to the non-moving party] and consider each party's motions on their own merits." Corbis Corp. v. Amazon.com, Inc., 351 F.Supp.2d 1090, 1097 (W.D.Wash. 2004).

### B. Duty to Defend and the Pollution Exclusion

An insurer's duty to defend "runs to claims that are merely potentially covered, in light of facts alleged or other-

wise disclosed" and "extends to all specified harm that may possibly have been caused by an included occurrence." Aerojet–Gen. Corp. v. Transp. Indem. Co., 17 Cal.4th 38, 58, 70 Cal.Rptr.2d 118, 948 P.2d 909 (1997) ("Aerojet"). "[T]he insurer must defend ·in some lawsuits where liability under the policy ultimately fails to materialize; this is one reason why it is often said that the duty to defend is broader than the duty to indemnify." Montrose Chem. Corp. v. Superior Court, 6 Cal.4th 287, 299, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993). "Any doubt ·as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." Id. at 299–300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.

■ The duty to defend "arises as soon as tender is made" and is "discharged when the action is concluded" unless it is "extinguished earlier" because the insurer shows "that no claim can in fact be covered." Aerojet, 17 Cal.4th at 58, 70 Cal. Rptr.2d 118, 948 P.2d 909. "[I]n an action wherein none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend." Id. at 59, 70 Cal.Rptr.2d 118, 948 P.2d 909.

■ "An insurer is entitled to limit its coverage to defined risks, and if it does so in clear language, [the court] will not impose coverage where none was intended." Am. States Ins. Co. v. Sacramento Plating, Inc., 861 F.Supp. 964, 968 (E.D.Cal.1994) (quoting Titan Corp. v. Aetna Casualty & Sur. Co., 22 Cal.App.4th 457, 469, 27 Cal. Rptr.2d 476 (4th Dist.1994)) (alteration in original). Here, the policy excluded coverage for ·contamination, but reinstated cov-

erage if the contamination was "sudden and accidental":

> It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

(Docket No. 28-8.)

■ When addressing similar exclusions, California appellate courts have held that the insured "establishes that [the insurer] is obligated to defend...if there is any potential that the release or escape of at least some of the pollutants was 'sudden and accidental.'" Vann v. Travelers Cos., 39 Cal.App.4th 1610, 1616, 46 Cal.Rptr.2d 617 (1st Dist.1995); A–H Plating, Inc. v. Am. Nat'l Fire Ins. Co., 57 Cal.App.4th 427, 437, 67 Cal.Rptr.2d 113 (1997); accord Arrowood Indem. Co. v. Bel Air Mart, No. 2:11–CV–00976 JAM–AC, 2014 WL 841314, at *5 (E.D.Cal. Mar. 4, 2014); Bolton v. Lumbermans Mut. Cas. Co., No. 05–1109 SC, 2006 WL 193519, at *4 (N.D.Cal. Jan. 23, 2006) ("[S]o long as [the insurer] is unable to conclusively establish that the underlying claim cannot fall within the ambit of the policies, it will be bound to defend Plaintiff."). As the California Supreme Court has more generally explained in the context of a dispute about the duty to defend, "the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any ·such potential." Montrose Chem. Corp., 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.[1]

---

1. Defendant relies on Aydin Corp. v. First State Ins. Co., 18 Cal.4th 1183, 1194, 77 Cal.Rptr.2d 537, 959 P.2d 1213 (1998), to argue that plaintiff has the burden of proving a sudden and accidental discharge. The California Supreme Court in that case, however,

"[I]n the phrase, 'sudden and accidental,' 'accidental' conveys the sense of an unexpected and unintended event, while 'sudden' conveys the sense of an unexpected event that is abrupt or immediate in nature." Shell Oil Co. v. Winterthur Swiss Ins. Co., 12 Cal.App.4th 715, 755, 15 Cal.Rptr.2d 815 (1st Dist.1993). Courts have repeatedly held that "sudden and accidental" cannot include gradual pollution. See, e.g., FMC Corp. v. Plaisted & Cos., 61 Cal.App.4th 1132, 1146, 72 Cal.Rptr.2d 467 (1998); ACL Techs., Inc. v. Northbrook Prop. & Cas. Ins. Co., 17 Cal.App.4th 1773, 1787, 22 Cal.Rptr.2d 206 (4th Dist.1993); Am. States Ins. Co. v. Sacramento Plating, Inc., 861 F.Supp. 964, 970 (E.D.Cal.1994). As a "coverage provision" the sudden and accidental exception to the pollution exclusion must be "construed broadly in favor of the insured." State v. Allstate Ins. Co., 45 Cal.4th 1008, 1018, 90 Cal.Rptr.3d 1, 201 P.3d 1147 (2009).

In determining whether the sudden and accidental exception applies, "the focus of analysis must be on the particular discharge or discharges that gave rise to [the] property damage," thus the court must "look[ ] first to the underlying claims to determine the polluting event." Id. at 1018–19, 90 Cal.Rptr.3d 1, 201 P.3d 1147. With a landfill like the one at issue in this case, the California Supreme Court has distinguished between (1) the initial discharge of the waste into the landfill; and (2) "the subsequent migration of wastes from the landfill to other property." Id. at 1019, 90 Cal.Rptr.3d 1, 201 P.3d 1147. The parties in this case do not dispute that the City's Cross-Complaint could seek damages for either of these discharges.

In Standun, Inc. v. Fireman's Fund Ins. Co., the insured operated a manufacturing facility in Compton and knowingly sent waste to the landfill on a regular basis. 62 Cal.App.4th 882, 73 Cal.Rptr.2d 116 (2d Dist.1998). The insured unsuccessfully argued that even though the initial discharges were not sudden and accidental, "there may have been subsequent sudden and accidental discharges of the pollutants from the landfill into the environment." Id. at 888, 73 Cal.Rptr.2d 116. The Second Appellate District rejected this theory because the underlying environmental actions sought to hold the insured liable for the discharges into the landfill and thus even if subsequent events were sudden and accidental they "were not the basis of the underlying claims ... and were therefore irrelevant." Id. The court explained, "Where hazardous waste material is deposited directly into a landfill, the relevant discharge of pollutants for purposes of the pollution exclusion is the initial release of the hazardous waste into the landfill, not the subsequent release of pollutants from the landfill into the water, air, and adjoining land." Id. at 891, 73 Cal.Rptr.2d 116.

The California Supreme Court subsequently distinguished Standun, Inc. and

held that "in an action seeking indemnity under a standard commercial general liability insurance policy, once the insurer carries its burden of proving that the general pollution exclusion applies, the insured bears the burden of proving that a claim comes within the 'sudden and accidental' exception." Aydin Corp., 18 Cal.4th at 1194, 77 Cal.Rptr.2d 537, 959 P.2d 1213 (emphasis added). The insured in Aydin Corp. did not seek defense costs and the Court did not address allocation of the burden of proof with respect to the duty to defend. See id. at 1194, 77 Cal.Rptr.2d 537,

959 P.2d 1213 n. 6 ("We note that some Courts of Appeal have held that regardless of which party bears the burden of proof when indemnification is at issue, when the defense duty is implicated, the insurer is obligated to defend its insured in an underlying action if there is any potential that the release or escape of at least some of the pollutants was 'sudden and accidental.' Since the duty to defend is not at issue in this case, we express no opinion as to which party should bear the burden of proof in that context.") (citations omitted).

explained that a subsequent release of the pollutants could be the relevant discharge under certain circumstances. In State v. Allstate Ins. Co., the state maintained "open, unlined evaporation ponds to contain the hazardous waste" and intentionally deposited hazardous waste into those ponds with the expectation that the waste would remain in the ponds. 45 Cal.4th at 1015, 90 Cal.Rptr.3d 1, 201 P.3d 1147. It turned out what the state believed was "an impermeable layer of rock" was actually "decomposed granite and fractured bedrock," which allowed chemical pollutants to seep into the groundwater. Id. at 1015–16, 90 Cal.Rptr.3d 1, 201 P.3d 1147.

In the underlying environmental action, "[t]he State was not held liable for polluting the evaporation ponds," and thus it did not matter that the initial deposit of the waste into the ponds was neither sudden nor accidental. Id. at 1018–19, 90 Cal. Rptr.3d 1, 201 P.3d 1147. Instead, "the State's liability was based on its having sited, designed, built, and operated the [ ] facility in such a negligent manner as to allow hazardous chemicals to escape from the evaporation ponds (by both seepage and overflow) into the surrounding environment." Id. at 1018, 90 Cal.Rptr.3d 1, 201 P.3d 1147. The relevant discharge for purposes of the sudden and accidental exception was thus "the release of wastes from the site when, because of the State's negligence, the site failed to contain them properly." Id. at 1020, 90 Cal.Rptr.3d 1, 201 P.3d 1147.

The Court further explained, "When, as in Standun, pollutants are deposited directly onto land or into water, without any attempt at containment, their further migration may reasonably be viewed as an aspect of property damage rather than an additional release or discharge; arguably, the only 'discharge' to be considered in such a case is the initial deposit." Id. at 1020, 90 Cal.Rptr.3d 1, 201 P.3d 1147. In contrast, the unlined evaporation ponds were "intended and expected" to contain the hazardous waste, even though they were "poorly sited and designed for that purpose." Id. "The instances of seepage and overflow from the ponds were therefore liability-causing events, not merely aspects of the property damage as in Standun." Id. at 1021, 90 Cal.Rptr.3d 1, 201 P.3d 1147.

### 1. Sudden and Accidental Discharge After the Initial Deposit

 Relying on Allstate Insurance Co., plaintiff first seeks to establish defendant's duty to defend as a matter of law based on the possibility that a sudden and accidental discharge occurred during the coverage period when flooding caused the groundwater to seep into the deposited waste and thereby contaminate the groundwater. Under this theory, plaintiff must show the possibility that it intended the landfill to contain the waste, but "sited, designed, built, [or] operated the [Greer Landfill] facility in such a negligent manner as to allow hazardous chemicals to escape from the [landfill cells]." Allstate Ins. Co., 45 Cal.4th at 1018, 90 Cal.Rptr.3d 1, 201 P.3d 1147.

### a. Intent for Landfill Cells To Contain Waste

In Allstate Insurance Co., the California Supreme Court found that waste was placed into containment in evaporation ponds because the state "intended and expected" the layer of rock beneath the ponds to contain the waste. Id. at 1015, 1020, 90 Cal.Rptr.3d 1, 201 P.3d 1147. Similarly, in Patz v. St. Paul Fire & Marine Ins. Co., the Seventh Circuit found that an "evaporation pit was a containing structure, despite its lack of artificial materials" lining the bottom of the pit. 15 F.3d 699 (7th Cir.1994). The Seventh Circuit found

that the unlined pit was a "containing structure" because the insureds believed that the "clay composition of the soil...would stop the water" from "leaching through the bottom of the pit." Id. at 704. These cases show that an insured could believe that waste was placed into containment even though the landfill is unlined.

Here, the CRWQCB's "Waste Discharge Requirements" for the Greer Landfill issued in 1970 conditioned plaintiff's and the City's ability to operate the landfill on the limitation that the deposited waste would "not cause a pollution of ground or surface waters." (Docket No. 32–6.) It further prohibited the "discharge of solid or liquid wastes, including leachate, to surface or underground waters." (Id.)

Although the CRWQCB recognized that "a portion of this parcel may be flooded on occasion," it seemed to believe that "discharge to ground or surface waters" would be avoided so long as waste was not "deposited below the elevation of seventy-seven feet above sea level" and "disposal trenches [were] bottomed above the anticipated high ground water level including the capillary fringe and surface waters

[were] diverted around the disposal site." (Id. at 1, 2, app. A.) Plaintiff has therefore shown the possibility that it, along with the CRWQCB, believed it was placing waste into containment if the cells were not excavated too close to the groundwater.

### b. Negligent Excavation

▇▇▇ Plaintiff must also show the possibility that it accidentally excavated the cells too close to the groundwater. Plaintiff put forth evidence that the County purchased parcels of land and excavated those parcels during the coverage period and that waste was deposited into the landfill during the coverage period. (E.g., Docket No. 32–3 at STATRAV2398-2411, STATRAV2415-2452.) Tom Brower, who worked at the Greer Landfill during the 1970's, indicates that he "saw the cells being excavated for the trash to be deposited in" and that the contractor "excavate[d] into wet clay during the constructions of the cells at the Site." (Bower Decl. ¶¶ 3, 7-8 (Docket No. 37–13).)[2] Bower explains that, "from his experience excavating in the Central Valley....when you hit clay in [the] area, you are just above the groundwater, which presents a danger of the groundwater rising into the excavated

---

2. Defendant objects to consideration of Bower's declaration because Bower was never identified in discovery, which closed on June 17, 2015. Federal Rule of Civil Procedure 37(c)(1) provides:

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

In determining whether the sanction of exclusion is merited, the court must consider "1) the public's interest in expeditious resolution of litigation; 2) the court's need to manage its docket; 3) the risk of prejudice to the defendants; 4) the public policy favoring disposition of cases on their merits; 5) the availability of less drastic sanctions." Wendt v. Host Int'l, Inc., 125 F.3d 806, 814 (9th Cir.1997).

Plaintiff's counsel represents that he did not discover Bower's identity until September 25, 2015. (Supp. Syz Decl. ¶ 12 (Docket No. 37–11).) Although plaintiff's counsel should have been more diligent in performing discovery, the untimely disclosure in this case does not merit the drastic sanction of exclusion, especially when three months remain before trial. (See Docket No. 36.) To address any prejudice defendant may suffer at trial from the untimely disclosure, the court will reopen discovery to allow defendant to depose Bower.

area." (Id. ¶ 9.) Brower's testimony, along with the CRWQCB's requirement that the trenches be "bottomed above the anticipated high ground water level," establishes the possibility that plaintiff accidentally excavated too deep during the coverage period.

### c. Flooding During Coverage Period

 Plaintiff also put forth evidence showing "above-normal rainfall" in February 1973, (Cal. Dep't of Water Res. Bulletin No. 69-73, California High Water 1972-1973 at iii, 1, 7, (Docket No. 37–10)), which resulted in the cresting of the Toulumne River on February 12, 1973, (see Nat'l Weather Serv.'s Advanced Hydrologic Prediction Servs. (Docket No. 37–9 at 3) (showing that the Toulumne River crested at 49.55 on February 12, 1973).)[3] The Greer Landfill is adjacent to the Toulumne River, (Docket No. 32–6 at 1), and the groundwater beneath the landfill is in "hydraulic communication" with the river and thus can rise as the river rises, (Docket No. 32–3 at STATRAV2317). According to plaintiff, when the river crested in February 1973, groundwater elevations potentially flooded the buried waste at the landfill and thereby potentially resulted in a sudden and accidental discharge of pollutants into the groundwater.

The CRWQCB's 2009 Cease and Desist Order corroborates the possibility that contamination occurred when the groundwater levels raised: "It is highly probable that groundwater rises into the waste mass at times." (Id.) Plaintiff has thus established the possibility that the groundwater level rose during the coverage period due to above-average rainfall and was potentially contaminated when it came in contact with the waste.

### d. Defendant's Showing

 Plaintiff has put forth sufficient circumstantial evidence establishing the possibility that the Greer Landfill was intended to contain the waste, but was suddenly contaminated when it seeped into the cells during heavy rain because plaintiff had accidentally excavated the cells too close to the groundwater. To negate plaintiff's showing of a potential for coverage, defendant "must establish the absence of any such potential." Montrose Chem. Corp., 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153. "Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, [] add no weight to the scales." Id.

Defendant primarily argues that plaintiff should have known contamination of the groundwater could occur because the landfill was unlined. Such evidence is insufficient to conclusively show that the discharge was not accidental as a matter of law. See Allstate Ins. Co., 45 Cal.4th at 1028, 90 Cal.Rptr.3d 1, 201 P.3d 1147 ("Evidence the State should have known flooding was likely, and should have taken addi-

---

**3.** For purposes of the motions before the court, the court takes judicial notice of the above-normal rainfall recorded in the Department of Water Resources Bulletin No. 69-73 (Docket No. 37–10) and the cresting of the Toulumne River memorialized in the National Weather Services Advanced Hydrologic Prediction Services (Docket No. 37–9). See Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it:...(2) can be accurately

and readily determined from sources whose accuracy cannot reasonably be questioned."); Sanchez v. City of Fresno, Civ. No. 1:12–00428 LJO, 2014 WL 2042058, at *2 (E.D.Cal. May 16, 2014) (taking judicial notice of weather information from the National Climate Data Center). Although defendant disputes the inferences to be drawn from this evidence, it does not dispute the accuracy of the information in these documents.

tional measures against it, is insufficient to prove, as an undisputed fact, that a waste discharge due to flooding was expected and therefore nonaccidental.").

Defendant also cannot extinguish its duty to defend based on plaintiff's inability to prove its right to indemnity at this stage in the litigation. While plaintiff is entitled to a defense under the policy upon a showing the possibility of a sudden and accidental discharge, it is entitled to indemnity under the policy only if it proves "that a claim comes within the 'sudden and accidental' exception." Aydin Corp., 18 Cal.4th at 1194, 77 Cal.Rptr.2d 537, 959 P.2d 1213 (emphasis added). There is little question that plaintiff cannot sustain this burden at summary judgment based on the evidence before the court, which establishes only the possibility of coverage.

As the California Supreme Court has explained, however, forcing plaintiff to establish coverage prior to resolution of the underlying action could prejudice the insured. Montrose Chem. Corp., 6 Cal.4th at 301, 24 Cal.Rptr.2d 467, 861 P.2d 1153. "For example, when the third party seeks damages on account of the insured's negligence, and the insurer seeks to avoid providing a defense by arguing that its insured harmed the third party by intentional conduct, the potential that the insurer's proof will prejudice its insured in the underlying litigation is obvious." Id. at 302, 24 Cal.Rptr.2d 467, 861 P.2d 1153. Forcing plaintiff to establish that it negligently excavated the landfill cells to establish coverage could undoubtedly prejudice it in the City's underlying action against it, and thus the court cannot resolve indemnity at this time. Id.; Montrose Chem. Corp. v. Superior Court, 25 Cal.App.4th 902, 907–11, 31 Cal.Rptr.2d 38 (2d Dist.1994).

### e. Conclusion

Because plaintiff has carried its burden of showing the possibility of coverage un-der the sudden and accidental exception to the pollution exclusion and defendant has not established the absence of a potential for coverage as a matter of law, defendant has a duty to defend plaintiff under the policy. Montrose Chem. Corp., 6 Cal.4th at 301, 24 Cal.Rptr.2d 467, 861 P.2d 1153. Accordingly, the court must grant plaintiff's motion for summary judgment with respect to defendant's duty to defend and deny defendant's motion for summary judgment on that issue.

### 2. Sudden and Accidental Discharge at the Time of Deposit

Plaintiff also seeks to show the possibility that a sudden and accidental discharge occurred when the waste was initially deposited into the landfill cells because the cells were accidentally excavated so deep that deposited waste was immediately exposed to the groundwater. Under this theory, plaintiff relies primarily on Kleinfelder's May 23, 2007 "South Area Groundwater Investigation Report" (the "Kleinfelder Report"), which states:

> An employee from Stanislaus County, who was present at the landfill in 1985 and 1986, reported that excavations in the landfill area north of Jantzen Road were dug to depths of approximately 80 feet below grade, which would have potentially immersed landfill waste in the groundwater table when groundwater elevations were high. In the southern area, waste cells were also dug in the summer close to groundwater.

(Docket No. 32-3 at STATRAV7233.) Although this description refers to excavations in 1985 and 1986, which is outside of the coverage period, plaintiff argues that the statement is circumstantial evidence about how the landfill was excavated ten years earlier during the coverage period.

Putting aside the attenuated relevance of evidence about excavations that oc-

curred a decade past the coverage period, defendant objects to consideration of the Kleinfelder Report on the ground that it contains inadmissible hearsay within hearsay. Because the Kleinfelder Report is central to plaintiff's theory of a sudden and accidental discharge at the time of the initial deposit of the waste, the court provided plaintiff with the opportunity to reply to defendant's evidentiary objections and resubmit any evidence in light of them. (See Docket No. 35.)

"Hearsay 'is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" Wagner v. County of Maricopa, 747 F.3d 1048, 1056 (9th Cir.2013) (quoting Fed. R. Evid. 801(c)). "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.[4]

Rule 801(d)(2) provides that an admission by the opposing party, including a statement made "by the party's agent or employee on a matter within the scope of that relationship and while it existed," is not hearsay. The Kleinfelder Report, however, was prepared at the behest of plaintiff and it is plaintiff's own employee who described the excavations from 1985 to 1986. (See Crandall Decl. ¶ 3 (Docket No. 37–14).) As is clear in Rule 801(d)(2), a party "may not offer his own statements as party admissions, as only statements offered against a party-opponent are admissible under Federal Rule of Evidence 801(d)(2)." United States v. Castro–Cabrera, 534 F.Supp.2d 1156, 1162 (C.D.Cal. 2008). Nor can plaintiff characterize the CRWQCB as the "opposing party" at the time of the investigation and somehow construe the report as against plaintiff's interest vis-à-vis the CRWQCB.

The Kleinfelder Report also does not become a public record subject to the exception in Rule 803(8) merely because the CRWQCB summarized the findings from the Kleinfelder Report in its documents. (E.g., Docket No. 20–3 ¶ 28); see Fed. R. Evid. 803(8) ("A record or statement of a public office if: (A) it sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.").

Although Michael Franck, the employee interviewed for the Kleinfelder Report, is now deceased, (Supp. Aggers Decl. ¶ 8 (Docket No. 37–12)), his statements do not come within any of Rule 804's hearsay exceptions when a declarant is unavailable. While his statement could be viewed as against plaintiff's interest, Rule 804(b)(3) allows admission of a statement against interest by an unavailable witness when that statement is "so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A). "A statement is against pecuniary and proprietary interest when it threatens the loss of employment, or reduces the chances for future employment, or entails possible civil liability." Gichner v. Antonio Troiano Tile

---

4. Plaintiff's reliance on a case discussing California's "invited error doctrine" in the context of a bar to federal-court habeas relief of a state conviction is misplaced. (See Pl.'s Evidentiary Br. at 12 (citing Jackson v. Herndon, Civ. No. 09–01145 RSWL, 2009 WL 3122552, at *5 (C.D.Cal. Sept. 25, 2009)).

& Marble Co., 410 F.2d 238, 242 (D.C.Cir. 1969). Although Franck reported that excavations were dug too deep, nothing in the record suggests that Franck was responsible for those excavations or that the statements were against his pecuniary interest for some other reason.

Lastly, the court finds that the hearsay statement within the Kleinfelder Report would not be admissible under Rule 807's residual exception, which provides:

> Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804: (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice.

▉ Fed. R. Evid. 807(a). "Under the Rule, a district [court] has the discretion to admit a hearsay statement in 'exceptional circumstances' so long as it meets the Rule's requirements." Draper v. Rosario, Civ. No. 2:10–32 KJM EFB, 2014 WL 1664917, at *4 (E.D.Cal. Apr. 25, 2014) (citing United States v. Bonds, 608 F.3d 495, 500–01 (9th Cir.2010)). "The most important consideration is whether the hearsay has circumstantial guarantees of trustworthiness 'equivalent to those present in the traditional exceptions to the hearsay rule.'" Id. (quoting Fong v. Am. Airlines, Inc., 626 F.2d 759, 763 (9th Cir.1980)).

▉ Plaintiff argues that the statement by the employee has "adequate alternative assurance of reliability," Giles v. California, 554 U.S. 353, 389, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), because it occurred during an administrative investigation. Plaintiff, however, initiated the investigation that culminated in the Kleinfelder Report and there is no indication that the interview was done in conjunction with the CRWQCB. The statement, which is not even in the employee's own words, was not made under oath or recorded. See United States v. Sanchez–Lama, 161 F.3d 545, 547–48 (9th Cir.1998) (holding that the district court erred in excluding video-taped statements that were made under oath by witnesses who were later deported). Nor is an employee's statement about excavations in 1985 and 1986 "more probative" about how the landfill was excavated during the coverage period of 1972 to 1975 "than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(3).

Because Franck's statements are inadmissible hearsay, the court cannot consider them in deciding plaintiff's motion for summary judgment. See Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Burch v. Regents of Univ. of Cal., 433 F.Supp.2d 1110, 1122 (E.D.Cal.2006) ("[C]urrent law in the Ninth Circuit is arguably that the rule against hearsay, Fed. R. Evid. 802, applies to evidence submitted in support of and in opposition to a motion for summary judgment."). Plaintiff has therefore failed to establish the possibility that a sudden and accidental discharge occurred at the time of the initial deposit of the waste.

## C. Site Investigations as Defense Costs

▉ Having found that defendant owes plaintiff a duty to defend, the parties next dispute whether plaintiff's site investigation expenses constitute defense costs. "In fulfilling its duty [to defend, the insurer] must undertake reasonable and necessary

efforts to avoid or at least minimize liability." Aerojet, 17 Cal.4th at 60, 70 Cal. Rptr.2d 118, 948 P.2d 909. The California Supreme Court has held that "the insured's site investigation expenses constitute defense costs" only if the following requirements are met:

First, the site investigation must be conducted within the temporal limits of the insurer's duty to defend, i.e., between tender of the defense and conclusion of the action. Second, the site investigation must amount to a reasonable and necessary effort to avoid or at least minimize liability. Third and final, the site investigation expenses must be reasonable and necessary for that purpose.

■■ Id. at 60–61, 70 Cal.Rptr.2d 118, 948 P.2d 909. "Whether the insured's site investigation expenses are defense costs that the insurer must incur in fulfilling its duty to defend must be determined objectively, and not subjectively from the viewpoint of either the insurer or the insured." Id. at 62, 70 Cal.Rptr.2d 118, 948 P.2d 909.

■■ "In the general case, it is the insured that must carry the burden of proof on the existence, amount, and reasonableness and necessity of the site investigation expenses as defense costs, and it must do so by the preponderance of the evidence." Id. at 64, 70 Cal.Rptr.2d 118, 948 P.2d 909. "By contrast, in the exceptional case, wherein the insurer has breached its duty to defend, it is the insured that must carry the burden of proof on the existence and amount of the site investigation expenses, which are then presumed to be reasonable and necessary as defense costs, and it is the insurer that must carry the burden of proof that they are in fact unreasonable or unnecessary." Id. Here, defendant did not breach its duty to defend and agreed, un-

der a reservation of rights, to provide a defense to the City's Cross-Complaint.

### 1. Pre-Tender Costs

Aerojet first requires that "the site investigation must be conducted within the temporal limits of the insurer's duty to defend, i.e., between tender of the defense and conclusion of the action." Here, plaintiff tendered the defense on January 27, 2012. Invoice 50613104 is dated January 22, 2013,[5] (Docket 29-16), and is for work completed in November 2012 through January 2013, (Acosta Decl. ¶ 4 (Docket 29-15)). Similarly, Invoice 50640959 is dated January 15, 2013, (Docket No. 29-17), and is for services provided in November 2012 through January 7, 2013, (Acosta Decl. ¶ 40). It is therefore undisputed that Invoices 50613104 and 50640959 satisfy the first Aerojet requirement because they are for services provided after tender of the defense and before completion of the underlying state action.

■■ While the specific invoices plaintiff submitted are limited to post-tender costs, plaintiff argues defendant is also obligated to cover pre-tender costs. Generally, "under California law, '[i]t is well understood...that an insurer's duty does not arise until defense is tendered by the insured and the known facts point to a potential for liability under the policy.'" Burgett, Inc. v. Am. Zurich Ins. Co., 875 F.Supp.2d 1125, 1127 (E.D. Cal.2012) (quoting Valentine v. Membrila Ins. Servs., Inc., 118 Cal.App.4th 462, 473, 13 Cal. Rptr.3d 125 (2004)) (alteration and omission in original). Insurance policies often seek to exclude coverage for pre-tender expenses through a "no voluntary payment" provision like the one included in the policy at issue in this case. (See Docket

5. Plaintiff initially indicates in its brief that Invoice 50613104 is dated January 22, 2012, which is five days before plaintiff tendered the defense. (See Pl.'s Mem. at 4:15.) It appears plaintiff merely misstated the year as the date on the invoice is January 22, 2013.

No. 28–7 ¶ 13 ("The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical or surgical relief to others as shall be imperative at the time of injury.").)

Nonetheless, California appellate courts have recognized that an insured might be able to seek pre-tender expenses despite inclusion of a "no voluntary payments" provision. In Fiorito v. Superior Court, the insureds retained counsel upon being served with the summons and complaint and did not tender the defense to the insurer until four months later after they located and reviewed their insurance policies. 226 Cal.App.3d 433, 438, 277 Cal. Rptr. 27 (4th Dist. 1990). Despite the provision excluding voluntary payments, the insureds alleged they did not voluntarily incur pre-tender defense costs because "they were 'compelled' to incur the pre-tender defense costs in order to respond to legal process and to protect their legal interests." Id.

The Fourth Appellate District held that the trial court erred in finding that the insurer was not required to pay pre-tender expenses as a matter of law because the insureds had sufficiently "raise[d] a question as to the 'voluntariness' of [their] actions in incurring pre-tender expenses." Id. at 439, 277 Cal.Rptr. 27; accord Shell Oil Co. v. Nat'l Union Fire Ins. Co., 44 Cal.App.4th 1633, 1649, 52 Cal.Rptr.2d 580 (2d. Dist.1996) (affirming finding after trial that "defense expenditures incurred during a four-month interval between service of summons and tender of defense" while the "the insureds had 'searched for insurance policies that might provide coverage or defense'" "were not barred from recovery, because they were not voluntary").

Here, the City filed its Cross-Complaint on August 24, 2011, but plaintiff did not tender the defense until five months later on January 27, 2012. Plaintiff's attorney, William Brown, indicates that he unsuccessfully searched for evidence of plaintiff's insurance policies in 2008, again in 2011, and a third time after the City filed its Cross-Complaint. (Brown Decl. ¶¶ 1-6 (Docket No. 32–9).) Mr. Brown's paralegal explains that, in January 2012, she located a reference to the insurance policy in a correspondence from 1975 between the City and plaintiff and that Mr. Brown's law firm was not aware of the policy until that discovery. (Depies Decl. ¶¶ 1, 3-4 (Docket No. 32–10).)

While this case is similar to Fiorito and Shell in that there was a relatively short delay between service of the summons and complaint and the tender because the insured had not yet located the insurance policy, the insureds in those cases sought pre-tender costs that were "involuntarily" incurred to "respond to legal process and to protect their legal interests." Fiorito, 226 Cal.App.3d at 438, 277 Cal.Rptr. 27; see Insua v. Scottsdale Ins. Co., 104 Cal. App.4th 737, 747, 129 Cal.Rptr.2d 138 (2d Dist.2002) (explaining that the insureds in Shell argued they were "'compelled' to respond to legal process and to protect their legal interests"). Here, neither party has identified any pre-tender defense costs plaintiff incurred to "respond to legal process and to protect their legal interests."

The only costs discussed in both motions are plaintiff's site investigations and the court therefore assumes that pre-tender site investigation costs are the only pre-tender costs at issue. Not only are pre-tender site investigation costs distinguishable from pre-tender costs to respond to legal process and protect legal interests, Aerojet unequivocally limits the inclusion of site inspections as defense costs to investigations that occur "between tender of the defense and conclusion of the action." Aerojet, 17 Cal.4th at 61, 70 Cal.Rptr.2d 118, 948 P.2d 909; accord Foster–Gardner,

Inc. v. Nat'l Union Fire Ins. Co., 18 Cal.4th 857, 886, 77 Cal.Rptr.2d 107, 959 P.2d 265 (1998) ("[S]ite investigation expenses incurred prior to the instigation of a lawsuit against the insured are not defense costs the insurer must incur.... because the insurer does not yet have a duty to defend the insured."). When the California Supreme Court articulated this requirement, the lower appellate courts had already decided Fiorito and Shell and thus the Supreme Court could have included a similar exception, but did not. Accordingly, the court must grant defendant's motion for summary adjudication with respect to any pre-tender site investigation costs.

### 2. Reasonable and Necessary Effort to Avoid or Minimize Liability

#### a. Compulsion by the CRWQCB

Next, the site investigation costs incurred "must amount to a reasonable and necessary effort to avoid or at least minimize liability." Aerojet–Gen. Corp., 17 Cal.4th at 61, 70 Cal.Rptr.2d 118, 948 P.2d 909. Defendant first argues that the site inspections were not related to defending against the City's Cross-Complaint because plaintiff incurred those costs in response to the CRWQCB's orders. The California Supreme Court in Aerojet, however, emphasized that an objective standard governs whether costs incurred were a reasonable effort to minimize liability "even in the general context of a governmental request or order for the insured to conduct a site investigation and/or to incur site investigation expenses." Id. at 63, 70 Cal.Rptr.2d 118, 948 P.2d 909. It does not matter, the Aerojet Court explained, whether the insured incurred the site in-

vestigation expenses to "resist liability," to "satisfy the government," for both of those reasons, or for an entirely different reason. Id.; see id. at 66, 70 Cal.Rptr.2d 118, 948 P.2d 909 ("What matters is what is done, not why."). Under this objective standard, it is simply irrelevant whether the insured incurred costs for the inspection voluntarily in an effort to minimize liability or involuntarily because the federal or state government ordered it to do so. Id. at 66, 70 Cal.Rptr.2d 118, 948 P.2d 909.

Defendant attempts to distinguish this case from Aerojet on the ground that the CRWQCB's Orders mandated the site inspections before plaintiff tendered the defense of the City's Cross-Complaint and thus plaintiff's "obligation to investigate and remediate the Site existed independently of, and years before, the City filed its cross-complaint." (Def.'s Mem. at 13:6-15.) While Aerojet requires that the site investigations occur after the tender of the defense, nothing in the opinion suggests that a government action mandating the same site investigation must also occur after the tender. Adopting defendant's position would abandon the objective inquiry Aerojet requires because the court would be speculating that plaintiff incurred the site investigation costs because it had a pre-existing obligation to do so. Aerojet rejected an inquiry into the "purely fictive" "mind and heart" of a government insured and emphasized that the controlling inquiry "is whether the site investigation expenses would be incurred against liability by a reasonable insured under the same circumstances." Aerojet, 17 Cal.4th at 63, 70 Cal.Rptr.2d 118, 948 P.2d 909 (citation omitted).[6]

---

**6.** Nor does Foster-Gardner, Inc. or County of San Diego v. Ace Property & Casualty Ins. Co., 37 Cal.4th 406, 33 Cal.Rptr.3d 583, 118 P.3d 607 (2005), support defendant's position. In Foster–Gardener Inc., the California Supreme Court held that a policy's provision for defense of a "suit" did not extend to "envi-

ronmental agency activity prior to the filing of a complaint," and "site investigation expenses incurred prior to the instigation of a lawsuit against the insured are not defense costs the insurer must incur" because a duty to defend under the policy did not arise until the "suit" commenced. 18 Cal.4th at 860-61, 886, 77

**b. Reasonable and Necessary Effort to Avoid or Minimize Liability in Light of the Allegations in the Cross-Complaint**

In the Cross-Complaint, the City alleges twelve claims against plaintiff: (1) indemnity/contribution under the Hazardous Substance Account Act; (2) declaratory relief under the California Hazardous Substances Accounting Act; (3) indemnity/contribution under the Porter Cologne Act; (4) declaratory relief under the Porter Cologne Act; (5) private nuisance; (6) private nuisance per se; (7) public nuisance; (8) public nuisance per se; (9) breach of contract; (10) dangerous condition of public property; (11) express indemnity/contribution; and (12) equitable indemnity/contribution. The Cross-Complaint alleges that plaintiff has operated the Geer Landfill since approximately 1970 and that it caused and is responsible for the "hazardous substance contamination in and around the Greer Landfill" and is "liable for the removal and remedial action costs incurred by" the City. (Menacher Decl. Ex. D ("City's Cross-Compl.") ¶¶ 11-13, 24 (Docket No. 29–7).) The Cross-Complaint further alleges that the contamination is "continuing and abatable" and "[b]ecause of the nature, extent and magnitude of the contamination at and/or near Greer Landfill is not fully known at this time, investigatory and remedial work has not been completed and may occur in the future" and the City "may incur necessary response costs, including but not limited to investigatory, monitoring and remedial expenses...in the future." (City's Cross-Compl. ¶¶ 20, 31).

Resolution of these claims will require findings about the extent and cause of the contamination. In light of plaintiff's claims and the equitable considerations required to allocate costs, some site investigation expenses would be incurred against liability by a reasonable insured because doing so allows the insured to identify the concentration and extent of the contamination and the cause of the contamination. For example, Gregory Acosta, who was the project manager of the investigation culminating in the Plume Investigation Report, indicates that the "purpose of the Plume Investigation Report was to (1) better define the nature and extent of the groundwater impacts, especially in the deeper zone, (2) to evaluate the area west of the Toulumne River with respect to landfill-related impacts and (3) to provide a groundwater model, both conceptual and numerical, for the groundwater system at the Site." (Acosta Decl. ¶¶ 2, 13.) He further explains that the work billed in Invoices 50643104 and 50640949 "included an investigation into the vertical and lateral extent of the groundwater impacts at the Site and the creation of a groundwater model both conceptual and numerical for groundwater system at the Site." (Id. ¶¶ 6, 11.)

**c. Inadequacy of Invoices**

The evidence before the court is inadequate, however, to determine as a matter of law whether all of the services in Invoices 50643104 and 50640949 would have been "incurred against liability by a reasonable insured under the same circumstances." Aerojet, 17 Cal.4th at 63, 70 Cal. Rptr.2d 118, 948 P.2d 909. The descriptions of the billed work are extremely

Cal.Rptr.2d 107, 959 P.2d 265. Ace Property & Casualty Ins. Co. dealt with excess indemnity coverage, not defense costs, and held that coverage for "damages" did not extend to "costs and expenses associated with responding to administrative orders to clean up and

abate soil or groundwater contamination outside the context of a government-initiated lawsuit seeking such remedial relief...." 37 Cal.4th at 406, 33 Cal.Rptr.3d 583, 118 P.3d 607.

vague. Invoice 50614103 attributes $32,306.30 to "Task 100," which is described as "ROUTINE LFG SERVICES" and $69,822.55 to "Task 200," which is described as "NON-ROUTINE GROUNDWATER/INVESTIGATIVE SERVICES." (Docket No. 29–16.) In his declaration, Acosta provides a short explanation of the services included in the Invoices, but it too lacks adequate detail to ensure that all costs in the Invoices are limited to site investigations that were reasonably and necessarily conducted to defend against the City's Cross-Complaint. (See Acosta Decl. ¶¶ 5-6.)

While site investigation expenses may "do double duty" by constituting defense costs and fulfilling a separate obligation imposed by state or federal environmental laws, Aerojet, 17 Cal.4th at 65–66, 70 Cal. Rptr.2d 118, 948 P.2d 909, clean-up costs are not defense costs simply because they "minimize liability" by remediating the contamination. For example, defense costs may "promote removal and remediation[ ] by enabling [the responsible party] to determine how to neutralize the substance in question" or "minimize liability[ ] by making it possible for it to show that it was not in fact the source of the discharge." Id. Costs are no longer site investigation costs, however, when they take the next step of remediating the contamination even though remediation could have the ultimate benefit of "minimizing liability." Cf. id. at 61, 70 Cal.Rptr.2d 118, 948 P.2d 909 n. 13 ("[A]t least generally, the same costs cannot be both indemnification costs and defense costs.").

It is unclear from the invoices whether all of the costs are attributable to reasonable investigations performed to defend against the City's Cross-Complaint or whether some of the costs were part of ongoing remediation and clean-up efforts entirely unrelated to any sudden and accidental discharges at issue in the City's Cross-Complaint. (See, e.g., Docket No. 28-13 at 11 (requiring plaintiff to "maintain in good working order any facility, control system, or monitoring device installed to achieve compliance with the waste discharge requirements," "conduct routine maintenance of the final cover, areas with interim cover, the precipitation and drainage control facilities, the groundwater, unsaturated zone and landfill gas monitoring systems, the landfill has extraction system, and any facilities associated with corrective action").)

Plaintiff also references 107 other invoices that it allegedly submitted to defendant for payment, but has not submitted those invoices to the court and it is unclear whether their motion for summary judgment is limited to Invoices 50643104 and 50640949 or extends to 107 additional invoices that are not before the court. Without the ability to meaningfully review the work performed, the court cannot determine as a matter of law that the charges were limited to investigations that a reasonable insured would have performed to defend against the City's Cross-Complaint.

Similar to Aerojet, "[w]hether and to what extent [any site investigation expenses] actually were" reasonable and necessary to defend against the City's Cross-Complaint remains an issue for trial. 17 Cal.4th at 65, 70 Cal.Rptr.2d 118, 948 P.2d 909. Accordingly, because plaintiff has not shown as a matter of law that the invoices defendant did not pay were defense costs under Aerojet, the court must deny plaintiff's motion for summary judgment with respect to those defense costs.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment be, and the same hereby is, GRANTED with respect to defendant's duty to defend under the policy and DENIED in all other respects; and defendant's motion for summary judgment be, and the same hereby

is, GRANTED with respect to any pretender costs and DENIED in all other respects.

IT IS FURTHER ORDERED that discovery is reopened for forty-five days from the date of this Order for the limited purpose of defendant deposing Tom Bower.